T.C. Memo. 2011-54

UNITED STATES TAX COURT

MARK AND LUCY KERMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15894-06.                    Filed March 8, 2011.

<u>Scott R. Cox</u> and <u>Brennan S. Cox</u>, for petitioners.

<u>Mark D. Eblen</u> and <u>Dessa J. Baker-Inman</u>, for respondent.

MEMORANDUM OPINION

GOEKE, <u>Judge</u>:  During 2000 Mark and Lucy Kerman sold 132,897 shares of Kenmark Optical, Inc. (Kenmark) stock, generating gain and leaving them facing a contingent tax liability.  Petitioners entered into a Custom Adjustable Rate Debt Structure (CARDS) transaction in order to reduce their tax liability.  The CARDS transaction generated a loss reported on petitioners' 2000 Form

1040, U.S. Individual Income Tax Return. Respondent's notice of deficiency determination would disallow the loss and impose a 40-percent penalty under section 6662.[1] For the reasons stated herein, we find that petitioners are not entitled to the claimed loss and are liable for the penalty.

## Background

The stipulations of fact and the accompanying exhibits are incorporated herein by this reference. Petitioners resided in Kentucky at the time of filing their petition.

1. Kenmark

Kenmark was founded in 1972 by Mark Kerman (Mr. Kerman), who was in charge of Kenmark from its inception through 2001. Kenmark imports eyeglass frames from the Far East, Italy, and France and sells them to retailers, optometrists, and opticians throughout the United States and abroad. During its first several years of existence Kenmark had sales of approximately $2 million. In 1990 sales increased to about $20 million, and by 2000 sales were approximately $35 million. At the time of trial, sales were about $45 million. For 2000 Kenmark was an S corporation. Its profits flowed through to its shareholders, including Mr. Kerman, with his share of the profits shown on his Schedule E, Supplemental Income and Loss. Before 2000 Mr. Kerman

---

[1]All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

was CEO of Kenmark and owned 100 percent of its stock. Additionally, Mr. Kerman was paid $780,000 as compensation and $450,000 in rents by Kenmark. During 2000 Mr. Kerman sold 27 percent of his stock to an employee stock ownership plan of Kenmark for $6 million and recognized gain of $5.4 million. Facing large contingent tax liabilities as a result of this gain, Mr. Kerman sought ways to offset the gain. One possible solution was a CARDS transaction.

2. Introduction to CARDS

Petitioners participated in a CARDS transaction in 2000. The transaction was developed by Chenery Associates, Inc. (Chenery), a promoter.

A. Chenery Associates, Inc.

Chenery was incorporated in 1993. Roy Hahn (Mr. Hahn) was a principal at Chenery. Chenery developed and promoted tax shelters, working with different investment banks in New York to implement its transactions. Chenery developed and implemented numerous CARDS transactions, including the CARDS transaction at issue, and received fees for each. A portion of the fees was used to pay the third parties involved in the specific CARDS transaction and their counsel.

B. Bruce Cohen and Craig Stone

Bruce Cohen (Mr. Cohen) and Mr. Kerman have been good friends for 25 years. Mr. Cohen learned about the CARDS

transaction at a seminar which taught ways to avoid tax. At one of the tax seminars, Mr. Cohen met Craig Stone (Mr. Stone), an employee at Chenery, where Mr. Stone was giving a presentation about CARDS transactions. Knowing that Mr. Kerman had recently sold stock and needed some tax help, Mr. Cohen told him about the CARDS transactions and introduced Mr. Stone to Mr. Kerman.

C. Decision To Enter Into a CARDS Transaction

On or about December 21, 2000, petitioners entered into a CARDS transaction.

4. The CARDS Transaction in General

A CARDS transaction has three phases: (1) The loan origination phase; (2) the loan assumption phase; and (3) the operational phase. In general, three parties are required to carry out a CARDS transaction: (1) A bank; (2) a borrower; and (3) an assuming party.

A. Loan Origination Phase

During the loan origination phase, the bank agrees to lend funds to the borrower. The borrower is a Delaware limited liability company with two members, both of whom are United Kingdom citizens to ensure that there are no U.S. income tax effects at the borrower level. The bank requires the borrower to be capitalized in an amount equal to 3 percent of the funds to be borrowed.

The loan is typically for 30 years, with principal due after 30 years but interest due annually. The credit agreement memorializing the loan imposes restrictions on how the loan proceeds can be used. Collateralization requirements imposed by the bank require the borrower to use the loan proceeds to acquire highly stable items such as Government bonds or highly rated commercial paper. After initially collateralizing the loan with high-value, stable assets such as Treasury bonds or promissory notes from the bank, the borrower can substitute collateral and gain access to the loan proceeds. In effect, the loan proceeds are initially used to purchase high-value items to serve as collateral for the loan until an item of equally high value can be swapped for the purchased items. This swapping of collateral purportedly frees some of the loan proceeds to be used for investment purposes as the borrowers see fit. However, the decision to swap collateral is not left to the discretion of the borrower. The bank ultimately decides whether and on what terms a certain asset or security can be used as collateral.

B. Loan Assumption Phase

The second phase is the loan assumption phase--when the assuming party would assume a portion of the loan on behalf of the borrower. The assuming party would receive only a portion of the loan proceeds but would agree to become jointly and severally liable for the entire amount of the original loan to the

borrower.[2]  The assuming party would assume a portion of the loan equal to the present value of the principal amount due in 30 years.

C.  Operational Phase

The operational phase consists of periodic "reset dates". Each reset date allows the borrower to exchange collateral, with corresponding adjustments of the interest rate and of the term until the next reset date.  The decision to swap collateral or adjust the interest rate at a reset date is left to the discretion of the bank.  If new collateral is proposed, it often results in a change of loan terms to reflect any adjustments to the amount of risk the parties face.

The purported purpose behind a CARDS transaction was to provide investment financing.  A CARDS participant would enter into the CARDS transaction and use the assumed portion of the loan proceeds to make an investment.  The investment property would then be swapped as collateral.  In theory, the investment would be successful if the rate of return on the investment property exceeded the costs of entering into the CARDS transaction.

---

[2]For instance, suppose the amount of the original loan from the bank to the borrower was $10 million.  The assuming party would assume a portion, $1 million, of the loan.  The $1 million would be transferred from the borrower to the assuming party, and in exchange the assuming party would become jointly and severally liable for the entire $10 million loan.

5. <u>Mr. Kerman and Third Parties</u>

    A. <u>Bayerische Hypo-und Vereinsbank AG</u>

Bayerische Hypo-und Vereinsbank AG (HVB) acted as the lender in the CARDS transaction at issue.

    B. <u>Colindale</u>

Colindale Financial Trading, L.L.C. (Colindale), was a special-purpose limited liability company with Elizabeth A.D. Sylvester and Michael Sherry, citizens and residents of the United Kingdom, as its members (the members). Colindale was formed solely for petitioners' CARDS transaction, acting as the borrower. Colindale was capitalized via a note receivable from the members in the amount of £102,145. The note receivable was Colindale's only asset listed on its balance sheet on December 20, 2000.

6. <u>The CARDS Transaction at Issue</u>

    A. <u>Origination</u>

On December 5, 2000, Colindale entered into a Credit Agreement with HVB Structured Finance (HVB) as its agent whereby HVB purportedly extended a Custom Adjustable Rate Debt loan (the loan) to Colindale in the amount of €5,700,000 with a stated 30-year term. The Credit Agreement provided that Colindale was required to give HVB its notice of borrowing at least 2 business days before the transaction. The loan term was divided into annual interest periods with the exception of the first interest

period, which extended from December 5, 2000, until January 5, 2001, and of the second interest period, which extended from the end of the first interest period to December 5, 2001.  Under the terms of the loan, HVB could adjust the interest rate annually. For the first interest period, the interest rate was set at the London Interbank Offered Rate (LIBOR) plus 50 basis points, or 5.51875 percent.  The Credit Agreement provided that the loan could be prepaid by the borrower, without premium or penalty, on the last day of any interest period, excluding the first.  The interest rate on the loan during the second interest period, ending December 5, 2001, was 5.5188 percent.

On December 5, 2000, Colindale issued a notice of borrowing that stated Colindale's commitment to borrow €5,700,000 and requested that the proceeds of the borrowing be credited to Colindale's euro account ending in 4501 (Colindale's euro account).  The notice of borrowing provided that the loan proceeds were to be credited to an account ending in 4501 "maintained at the offices of * * * [HVB]."  Colindale's obligation to repay the loan was documented by a promissory note issued by Colindale to HVB for €5,700,000, due on December 5, 2030.  On December 5, 2000, HVB credited to Colindale €5,700,000 in Colindale's euro account.

On December 5, 2000, Colindale entered into a Master Pledge and Security Agreement (MPSA) that pledged to HVB all of

Colindale's holdings at HVB and their proceeds as collateral for the loan. The MPSA provided that if the loan was in default, HVB had the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate, or dispose of all or any portion of Colindale's pledged collateral and apply any proceeds from the foregoing to expenses incurred in retaking, holding, collecting, or liquidating Colindale's pledged collateral as well as to the payment of amounts due under the Credit Agreement and/or other loan documents. On December 5, 2000, Colindale entered into a Deposit Account Pledge in favor of HVB. Chenery deposited €2,375 into HVB for credit to Colindale's balance. On December 22, 2000, Colindale purchased an HVB time deposit in the amount of €4,847,375, maturing on December 5, 2001, at a rate of 5.01875 percent. Colindale's HVB time deposit paid a rate that was 50 basis points less than the loan rate.

B. Assumption by the Members

On December 21, 2000, Colindale entered into an Assumption Agreement with petitioners which provided that petitioners became jointly and severally liable for Colindale's obligations under the Credit Agreement and promissory note, which included repayment of the loan principal of €5,700,000. On December 21, 2000, petitioners entered into an Assuming Party Master Pledge and Security Agreement (the Assuming Party MPSA) that pledged to

HVB as collateral all of petitioners' holdings at HVB and their proceeds.

If the loan was in default, HVB had the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate, or dispose of all or any portion of petitioners' pledged collateral and apply any proceeds from the foregoing to expenses incurred in retaking, holding, collecting, or liquidating petitioners' pledged collateral as well as to the payment of amounts due under the Credit Agreement and/or other loan documents. The pledged collateral was held at HVB under a dollar pledge HVB pooled account with a number ending in 4502, and in a euro pledge HVB pooled account with a number ending in 4501. Sylvie DeMetrio, an employee of HVB, stated that HVB did not need an account for each purchaser of the CARDS transaction, only a customer number not associated with any account, and that HVB would instead use "one retail account under [Financial Engineering] which will act as an omnibus account running the money through for the clients." Petitioners' customer number at HVB was 310875.

The assuming party MPSA provided that petitioners could request to substitute other collateral in place of the pledged collateral, but only at HVB's discretion. If HVB were to release a portion of the loan proceeds, the assuming party MPSA required

that petitioners execute and deliver a deposit account pledge and a securities account control agreement.

On December 21, 2000, Colindale and petitioners entered into a purchase agreement whereby Colindale sold to petitioners 15 percent, or €855,000, of Colindale's HVB deposit that had been pledged as collateral. The purchase agreement provided that petitioners would be jointly and severally liable for all obligations under the loan not covered by Colindale's collateral. Colindale and petitioners agreed that Colindale would be responsible for interest payments on the loan and petitioners would be responsible for all other amounts due under the terms of the loan to the extent not covered by seller collateral. If Colindale did not pay the interest, petitioners had to pay the interest. Colindale could have sold some of the collateral to make the interest payments. Petitioners would have to make up the shortfall in the collateral. If Colindale did not make the interest payments, petitioners waived their right of contribution against Colindale. Petitioners agreed to waive their right of contribution against Colindale because the CARDS promoters told them to do so. However, the waiver did not prevent petitioners from obtaining reimbursement from Colindale's collateral if Colindale violated the payment arrangement. Section 5.3(f) of the Purchase Agreement provided that Colindale would not request the release or withdrawal of any collateral without petitioners'

prior written consent. Petitioners did not waive their right of contribution against Colindale for any breach of section 5.3(f) of the purchase agreement.

The Purchase Agreement provided that Colindale's collateral would be applied first to interest payments, then to the seller's profit, then to the discharge of credit obligations under the loan other than principal, and lastly to the payment of loan principal.

On December 20, 2000, Kenmark wired $500,000 to HVB. That amount was credited to petitioners in an HVB pooled account with a number ending in 4502. On December 20, 2000, Kenmark debited its account payable to petitioners in the amount of $500,000. HVB debited €855,000 from Colindale's balance and credited it to petitioners' balance in an HVB pooled account with a number ending in 4301.

The CARDS promoters instructed petitioners to sell the euro on the date they wanted the tax loss. On December 22, 2000, petitioners exchanged €346,666 of the €855,000 for $312,000.[3] On December 27, 2000, petitioners told HVB to sell "100% of the Euros in my account (€855,000)" before the close of business on December 27, 2000. HVB had already exchanged for $312,000, on

_____

[3]On Dec. 22, 2000, petitioners entered into a forward exchange contract to exchange $880,600 for €925,000 on Dec. 5, 2001. The forward contract was in the amount necessary to pay off petitioners' 15-percent portion of the loan.

December 22, 2000, €346,666.67 of the euro credited to petitioners' balance before they told HVB to do so.  On December 27, 2000, petitioners exchanged €508,333 of the €855,000 for $472,749.69.  Petitioners were credited with a total of $784,750 from their foreign currency exchanges.  As a result of the conversion, petitioners claimed an ordinary loss of $4,250,000 for the taxable year 2000.

On Form 4797, Sales of Business Property, of their 2000 Federal tax return, petitioners claimed a $4,251,389 loss from the sale of foreign currency.  On January 3, 2001, Mr. Hahn of Chenery wired $48,356 to HVB.  That amount was credited to petitioners' balance in an HVB pooled account with a number ending in 4502.  The amounts credited to petitioners' balances in the HVB pooled accounts were used to purchase three different time deposits, each of which had a maturity date of December 5, 2001.  On December 22, 2000, petitioners purchased the first time deposit (time deposit 1) in the amount of $811,624, with an interest rate of 6.0 percent and a maturity date of December 5, 2001.

On January 2, 2001, petitioners purchased the second time deposit (time deposit 2) in the amount of $431,009 with an interest rate of 5.9425 percent and a maturity date of December 5, 2001.  On January 3, 2001, petitioners purchased a third time deposit (time deposit 3) in the amount of $48,356 with an

interest rate of 5.78875 percent and a maturity date of December 5, 2001. During the year 2001, time deposits 1 and 2 were in Financial Engineering's U.S. dollar account with a number ending in 4502 (HVB's USD account). On June 12, 2001, time deposit 2 in the amount of $431,009 plus accrued interest of $11,454.57 (totaling $442,463.57) was credited to petitioners in HVB's USD account. On June 13, 2001, $300,000 of the proceeds of time deposit 2 was wired from HVB to Chenery in partial payment of Chenery's fees due from petitioners.

On August 30, 2001, petitioners sent a letter to HVB and Colindale stating their intention to "pay-off (and thereby terminate)" the loan on December 5, 2001. On October 31, 2001, time deposit 1 in the amount of $811,624, plus accrued interest of $42,339.72 for a total of $853,963.72, was credited to petitioners' balance in HVB's USD account. In October 2001 petitioners executed a "Control Agreement" between Kerman Investments, L.L.C., and HVB for a Salomon Smith Barney (SSB) account with a number ending in 6627 and in the name of HVB "Secured Party F/B/O Kerman Investments, LLC." Sylvie DeMetrio informed petitioners' attorneys that to use their portion of the loan as operating capital for Kenmark, petitioners would have to provide firm collateral to guarantee the proceeds, such as a letter of credit from a major bank, a certificate of deposit, or other safe collateral acceptable to HVB.

As of August 30, 2001, HVB notified petitioners' attorney that it would not be cost effective for petitioners to extend the CARDS loan past December 5, 2001, because the bank would exercise its right under the Credit Agreement to increase the spread on the loan to an unfavorably high rate. On October 31, 2001, after petitioners had given HVB notice of their intent to terminate the loan, HVB transferred $400,000 of petitioners' balance to SSB account No. 6627. By way of the Control Agreement, HVB controlled the $400,000 transferred to SSB account No. 6627. Pursuant to the Control Agreement, SSB account No. 6627 had to be a "cash securities account" meaning petitioners could invest only in cash, cash equivalents, or qualified municipal bonds, which were certain AAA-rated bonds. Petitioners had to obtain HVB's prior written consent to make any other investments.

Petitioners could not withdraw any of the proceeds from SSB account No. 6627 unless they replaced those proceeds with cash, cash equivalents, or qualified municipal bonds of equal value. If petitioners wanted to replace the proceeds with marketable securities, they had to obtain HVB's prior written consent. Petitioners stated that the $400,000 transferred from HVB to SSB account No. 6627 in the name of Kerman Investments, L.L.C., was a payment of fees to the CARDS promoters. The $400,000 transferred from HVB to SSB account No. 6627 could not have been a payment of fees to the CARDS promoters. After HVB wired the $400,000 to SSB

account No. 6627, the remaining $453,963.72 was immediately deposited back to time deposit 1. Petitioners could not withdraw or transfer any of the $400,000 from SSB account No. 6627.

On November 13, 2001, HVB issued a mandatory prepayment election notice to petitioners which stated that the outstanding principal amount of the loan, plus accrued interest, would be due on December 5, 2001. On November 20, 2001, Sylvie DeMetrio emailed petitioners' attorneys that the payoff of petitioners' portion of the loan was "not an early unwind, this is a scheduled reset and the bank has simply opted not to continue with the facility as it stands. There have been no special circumstances surrounding the unwind of this transaction."

On December 5, 2001, petitioners' time deposit 3 at HVB matured. Because of the $400,000 wire from HVB to Kerman Investments, L.L.C., petitioners had a shortfall of $184,798.92 to unwind the CARDS transaction. On December 4, 2001, petitioners wired $184,798.92 from an account titled HVB "Secured Party F/B/O Kerman Investments, LLC," with a number ending in 6627 to HVB. All of the $400,000 withdrawn from HVB remained in SSB account No. 6627 until $184,798.92 was transferred back to HVB on December 4, 2001. The remaining funds stayed in SSB account No. 6627 until withdrawn on January 9, 2002, which is after the loan was repaid on December 5, 2001. On December 5, 2001, the forward contract matured and settled, causing $880,600

in HVB's USD account to be exchanged for €925,000, which was credited to petitioners' balance in an HVB pooled account with a number ending in 4501. The actual amount required to pay off petitioners' 15-percent portion of the loan was €924,906.27.

On December 5, 2001, HVB debited petitioners' €924,906.27 balance in the account with a number ending in 4501 and credited this amount to Colindale. On December 5, 2001, Colindale paid €6,018,937.76 from its euro account in repayment of the CARDS loan, which comprised €5,700,000 of principal and €318,937.76 of interest. Of the €6,018,937.76, petitioners provided €924,906.27, which was credited into Colindale's euro account on December 5, 2001. After the payoff of petitioners' portion of the loan, HVB held $581.91 of petitioners' funds.

On December 24, 2001, HVB wired $581.91 to SSB account No. 6627, which was in the name of HVB "Secured Party F/B/O Kerman Investments, LLC". On January 2, 2002, Michael Shields (Mr. Shields), chief financial officer of Kenmark during 2000, faxed to Steve Goodman (Mr. Goodman), petitioners' attorney, their Termination Agreement, dated December 12, 2001, for their CARDS transaction, and asked Mr. Goodman to review the agreement and let him know whether he approved of it. Petitioners did not sign the Termination Agreement until after January 1, 2002. On January 8, 2002, HVB sent notice to SSB terminating the Control

Agreement for Kerman Investments, L.L.C.'s SSB account No. 6627, thereby releasing this account from collateralization.  On January 9, 2002, petitioners transferred $581.91 from SSB account No. 6627 to an SSB account with a number ending in 1627 in the name of Kerman Investments, L.L.C.  On January 9, 2002, petitioners transferred $216,182.62 from SSB account No. 6627 to the SSB account with a number ending in 1627.  That amount was the balance of account No. 6627.

Colindale's members signed a Unanimous Written Consent to dissolve Colindale as of July 25, 2002.  On July 31, 2002, Colindale filed a Certificate of Cancellation with the Delaware secretary of state's office because Colindale had no assets and ceased transacting business.

## Discussion

### I.  Burden of Proof

Tax deductions are a matter of legislative grace, and a taxpayer has the burden of proving that he is entitled to the deductions claimed.  Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  The burden of proof on factual issues that affect a taxpayer's liability for tax may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue."  Sec.

7491(a)(1).  Petitioners have failed to establish that they have satisfied the requirements of section 7491(a)(2).  On the record before us, we find that the burden of proof does not shift to respondent under section 7491(a).

II.  Economic Substance Doctrine

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."  Gregory v. Helvering, 293 U.S. 465, 469 (1935).  However, even if a transaction is in formal compliance with Internal Revenue Code provisions, a deduction will be disallowed if the transaction is an economic sham.  Am. Elec. Power Co. v. United States, 326 F.3d 737, 741 (6th Cir. 2003).

The parties have not formally stipulated where an appeal of this case would lie.  Both petitioners and respondent focus on caselaw of the Sixth Circuit in their posttrial briefs.  The Court of Appeals for the Sixth Circuit has stated:  "'The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses.'"  Dow Chem. Co. v. United States, 435 F.3d 594, 599 (6th Cir. 2006) (quoting Rose v. Commissioner, 868 F.2d 851, 853 (6th Cir. 1989), affg. 88 T.C. 386 (1987)).  "[W]hen 'it is patent that there [is] nothing of substance to be realized by [the taxpayer] from [a] transaction beyond a tax

deduction,' the deduction is not allowed despite the transaction's formal compliance with Code provisions." Am. Elec. Power Co. v. United States, supra at 741 (quoting Knetsch v. United States, 364 U.S. 361, 366 (1960)). "If the transaction has economic substance, 'the question becomes whether the taxpayer was motivated by profit to participate in the transaction.'" Dow Chem. Co. v. United States, supra at 599 (quoting Illes v. Commissioner, 982 F.2d 163, 165 (6th Cir. 1992), affg. T.C. Memo. 1991-449). "'If, however, the court determines that the transaction is a sham, the entire transaction is disallowed for federal tax purposes,'" id., and no subjective inquiry into the taxpayer's motivation is made, id. at 599. A court "will not inquire into whether a transaction's primary objective was for the production of income or to make a profit, until it determines that the transaction is bona fide and not a sham." Rose v. Commissioner, supra at 853.

III. Petitioners' Arguments

Petitioners argue that the CARDS transaction had economic substance and was entered into to provide flexible cash reserves and lending opportunities to fund Kenmark. Petitioners contend that the CARDS transaction was a bona fide transaction that was specifically designed to create a synthetic, 30-year coupon lending facility.

According to petitioners, the CARDS transaction generated income and had economic substance separate and distinct from the economic benefit derived from a tax deduction in the form of $63,194 earned on the amounts held by HVB Bank and the off-balance-sheet financing provided to Kenmark from the CARDS loan.

Lastly, petitioners argue that they are entitled to claim the loss because they acquired property subject to a loan by paying consideration and assuming liability for the loan. Petitioners contend that because they purchased the assets, part of the consideration they gave was their assumption of the loan, for which they became jointly and severally liable and thus at risk for the repayment of the entire amount of the loan. Upon the sale of the foreign currency, the basis of which was the entire loan, petitioners generated an ordinary loss valued at the difference between the value of the currency purchased and the entire loan. The loss from the exchange and sale of the loan assets was a foreign currency loss under section 988 because it was an acquisition of a "nonfunctional" currency. Consequently, petitioners are entitled to claim an ordinary loss calculated as the difference between the basis of the euro-currency deposit and its value.

IV.  Respondent's Arguments

Respondent first argues that the CARDS transaction lacked economic substance and had no practical effect other than the creation of income tax losses because:  (1) No economic outlay to create basis occurred; and (2) the claimed loss was not incurred in a trade or business or in a transaction entered into for profit.

Respondent claims that petitioners' CARDS transaction was almost identical to the one in Country Pine Fin., L.L.C. v. Commissioner, T.C. Memo. 2009-251.  In Country Pine Finance, losses were disallowed in a CARDS transaction funded by another bank because the CARDS transaction "lacked economic substance".  In the opinion the Court determined that the transaction lacked economic substance because it "consisted of prearranged steps entered into to generate a tax loss; the loan proceeds were never at risk and the transaction giving rise to the tax loss was cashflow negative."

Similar to Country Pine Finance, all of the proceeds remained as security at the bank for the sole source of repayment of the loan and therefore the bank bore no risk.  Petitioners purchased a foreign exchange forward contract that allowed them to convert bank time deposits, denominated in dollars, back into euro, a year after the loan was initiated.  Like Country Pine Finance, less than a year after the bank and the L.L.C. entered

into the credit agreement, the bank informed the other parties that it was no longer willing to maintain the loan. All of the borrowed funds were paid back out of the pledged collateral, and all amounts lent by the bank were guaranteed by collateral purchased from the bank with the loan proceeds. Additionally, the promoter in this transaction is the same as in Country Pine Finance.

Respondent argues that even if petitioners believed that the CARDS transaction was a sensible method to provide financing for Kenmark, that belief would not save the transaction because they have failed the subjective inquiry, as they were not motivated by profit to participate in the CARDS transaction. The steps in the CARDS transaction were part of a single transaction designed to create an inflated basis and corresponding tax loss without any economic outlay or loss.

Next, respondent argues that petitioners were never at risk because all of the proceeds remained as security at the bank for the sole source of repayment of the loan and, therefore, they bore no risk. Respondent argues that the bank required the entire loan to be fully collateralized, and the loan was collateralized by the funds from the loan itself in a pooled account containing the proceeds of other CARDS transactions. Petitioners invested their portion of the loan in HVB time deposits which had a stated interest rate slightly higher than

that of the loan, but actually a lower effective interest rate. Petitioners knew that the largest portion of the loan, Colindale's portion, would remain at the bank as collateral and that they were not at risk for it.

## V.  Analysis

### A.  Objective Analysis

We begin by analyzing the objective profit potential of the transaction giving rise to the claimed tax loss.  The transaction giving rise to the loss was the swap of €5,700,000 for $750,000 as part of the cross-currency swap.  Petitioners claimed a basis totaling $5 million in the euro and the promissory note.  As a result of this inflated basis, petitioners claimed losses totaling $4,251,389.[4]

There were no independent third parties to this transaction. Chenery was the initial promoter of CARDS.  HVB was one of at least two banks Chenery used for the approximately 60 CARDS transactions it sold.  Like the L.L.C. in Country Pine Finance, Colindale's sole purpose was effecting the CARDS transaction and it dissolved less than a year after the transaction ended.  The fees paid to accommodating parties in connection with CARDS were based upon the amount of the loan and tax loss created and dependent upon the assumption of the loan.  The CARDS transaction

---

[4]Included in this amount is $1,389 for amortization fees.

consisted of prearranged steps entered into to generate a tax loss; the loan proceeds were never at risk.

Further, Kenmark never received any of the loan proceeds. Kenmark actually paid $500,000 on petitioners' behalf to HVB for their CARDS transaction. The terms of the National City Bank loan were much more favorable than those of the loan. In 2000 and 2001 the interest rate on the National City Bank loan was prime minus one-half percent, instead of the LIBOR plus 50 basis points, which was the rate on the loan. The interest on the National City Bank loan was tax deductible for Kenmark. The interest on the loan was to be paid with Colindale's collateral, and petitioners had to replenish the collateral and therefore were effectively making the interest payments. However, they could not deduct those interest payments. No investment-banking fee was charged for Kenmark's National City Bank loan, and Kenmark actually had access to those loan proceeds and could use them in its operations. There was no requirement that the proceeds from the National City Bank loan be left on deposit with the bank. Additionally, Mr. Shields testified that in 2000, Kenmark was routinely able to get credit on favorable terms. This is supported by the fact that interest on Kenmark's loan was at the rate of prime minus one-half percent for 2000 and 2001, which equaled a loan rate of 9 percent as of August 31, 2000.

A. Lawrence Kolbe (Dr. Kolbe), a financial economist, testified that the CARDS transaction resulted in a negative net present value to petitioners of €555,000 on the borrowing of €855,000. This negative net present value is created by the loan itself and would be a material drag on any investment undertaken by petitioners. Dr. Kolbe calculated that the cost of capital for the loan was approximately 5.51875 percent but that petitioners expected to pay interest at a rate of just under 70 percentage points above the market rate. Because petitioners were effectively making the annual interest payments on the CARDS loan, Dr. Kolbe testified that the total after-tax interest expense on the loan was more than twice that of a normal loan. He testified that regardless of what investment might have been made with petitioners' portion of the loan proceeds, the additional interest expense would greatly reduce the profitability of that investment relative to proceeds of a normal loan. According to Dr. Kolbe, the longer the loan remained outstanding, the worse the economic outcome for petitioners. Petitioners' obligation to repay the principal in 30 years was a liability with a value approximately twice as large as the amount HVB credited them for accepting it. The CARDS transaction did not provide petitioners with a reasonable possibility of profit. Kevin Gibbs (Mr. Gibbs), petitioners' certified public

accountant, admitted that petitioners did not make a profit on the CARDS transaction.

Further, the interest rate paid on petitioners' time deposits at HVB was actually less than the loan rate. HVB effectively paid petitioners a euro rate of about 2.1 percent, not a dollar rate of about 6 percent, on their dollar time deposits. Because HVB paid lower interest rates on petitioners' deposits than it charged on the loan, leaving the loan proceeds in the Bank guaranteed a loss to them on their portion of the proceeds. Dr. Kolbe testified that a normal loan would be a much less costly way to finance whatever investments petitioners had in mind. He determined that putting aside the tax deduction, the economically rational course of action is to not undertake the CARDS transaction at all and to end it as soon as possible. The loan makes no economic sense as a source of financing.

The fact that HVB could permit substitution of collateral does not save this transaction from being a sham. While HVB could allow substitution of collateral, petitioners had no right to substitute collateral. They had only the right to request that collateral be substituted, and HVB, in its sole discretion, could consent or refuse the substitution.

Colindale's sole purpose was effecting the CARDS transaction, and it dissolved less than a year after the transaction ended. Even if the other parties had been

independent, the CARDS transaction would have had no practicable economic effect on them. HVB issued the loan to Colindale, and the proceeds were invested in HVB time deposits. Colindale never received the loan proceeds; the proceeds stayed at HVB. Petitioners did not receive the assets upon purchase. Rather, the assets remained in the possession of the bank, and, even before petitioners' instruction to do so, HVB converted the assets to dollars. The dollars were used to purchase HVB time deposits which remained at HVB. Petitioners never had access to the loan proceeds. The proceeds remained in the possession of HVB. Petitioners entered into the forward contract, which protected them from any foreign currency risk. At all times, HVB had sole dominion and control over the loan proceeds. After 1 year, the proceeds, which never left the bank, were used to repay the loan. The only economic consequence of this transaction was petitioners' $4,251,389 tax deduction, which created a tax benefit of $1,248,876, the amount of the deficiency here. Colindale was immune from any offsetting gain because of the members' foreign citizenship.

The CARDS transaction was designed to offset petitioners' long-term capital gain income from their sale of the Kenmark stock in 2000. HVB kept a spreadsheet of assuming parties and the amounts of their desired losses. This spreadsheet shows that the amount of the loss, before fees, petitioners reported on

their 2000 income tax return is the amount of loss petitioners desired.  The amounts reported on petitioners' 2000 return do not match the realities of the CARDS transaction but instead work to create a loss in the exact amount petitioners desired.  Although they were credited with $784,750 when they exchanged the €855,000, petitioners' 2000 return reports an amount realized of $750,000 in foreign currency.  This lower basis creates an even larger loss of $4,250,000.  In fact, petitioners did not tell Mr. Gibbs, their return preparer, the actual amounts from the CARDS transaction.  Instead, Mr. Gibbs relied on the promotional materials provided by Chenery to determine the amounts to be reported on petitioners' 2000 tax return.

B.  <u>Subjective Analysis</u>

The claimed loss is also disallowed because the members did not have a nontax business purpose for entering into the CARDS transaction.  Although the members testified that the decision was made to secure financing for future Kenmark investments, that testimony is not credible.  There is substantial evidence that the decision to enter into the CARDS transaction was solely tax motivated.

Mr. Cohen, a longtime friend of Mr. Kerman and one of his financial advisers, introduced him to Mr. Hahn and Mr. Stone of Chenery, the CARDS promoters.  Mr. Cohen learned about the CARDS transaction while attending a meeting discussing ways to avoid

paying taxes and knew that Mr. Kerman was interested in a way to eliminate his large income tax liability from selling his Kenmark stock. Mr. Cohen's gross fee from Chenery for Mr. Kerman's CARDS transaction was 10 percent of Chenery's fee, or $50,000. Mr. Cohen testified that before the CARDS transaction, Mr. Kerman had considered another tax shelter called the "basis boost" to mitigate petitioners' tax liability. He also testified that Mr. Kerman's interest in the CARDS transaction had nothing to do with Kenmark or its operating needs but was based solely on reducing petitioners' tax liability from their sale of the Kenmark stock.

Another of petitioners' stated business purposes for the CARDS transaction was to borrow euro at a low rate to conduct business in Europe and to serve as "a low risk hedge to overseas transactions." Contrary to the stated intent, petitioners exchanged the euro for dollars almost as soon as they were credited to them.

Dr. Kolbe testified that if petitioners' business purpose was to borrow euro, petitioners' conversion of the euro to dollars was wasteful because of the implicit fee to HVB for the forward contract to convert the dollars back to euro at the end of the loan. He stated that the forward contract locked in petitioners' interest rate on its part of the loan in euro, not dollars. Dr. Kolbe determined that the conversion of the euro to dollars, plus the purchase of the forward contract, had the

economic effect of immediately converting petitioners' just-converted dollar loan proceeds back into euro. Mr. Kerman testified that he thought he was assuming the loan to purchase euro and that his expected profit on the CARDS transaction was to be based on currency fluctuation. However, the euro were exchanged for dollars almost as soon as they were credited to him, and petitioners had no income from currency fluctuation in connection with their CARDS transaction.

Before entering into the CARDS transaction, petitioners did not prepare or have prepared for them a business plan, risk analysis, profitability projection, or financial projection. Mr. Kerman stated that they instead relied on the business plan, risk analysis, profitability projection, and financial projection in the CARDS promotional materials. However, the promotional materials contain none of these. Petitioners believed that the interest rate on the loan was approximately 3 percent, but admitted that they were never able to determine the loan's actual interest rate. If petitioners did not know the interest rate on the loan, absent the tax loss, they could not have determined how the CARDS transaction could be profitable.

Mr. Kerman testified that neither he nor his financial advisers, legal advisers, or accounting advisers ever prepared business plans or profitability projections because only large companies did "those types of things". Without this information,

Mr. Kerman could not have determined how he could generate a return on the assets that exceeded the all-in cost of borrowing. Mr. Kerman developed Kenmark into a successful, multimillion-dollar business and that he did so without the use of a business plan or a profitability projection is not credible.

Mr. Kerman testified that he understood that he was assuming a $5 million loan but did not know whose loan he was assuming or the identity of the original borrower. Mr. Kerman never heard of Colindale or met either of the members or any of its representatives. Therefore, he is claiming to have been willing to assume a $5 million liability of a newly formed entity owned by strangers. Petitioners stated that the reason they required Colindale to represent that neither it nor the members or its manager had a permanent establishment in the United States was that the CARDS promoters told them to do so.

Petitioners did not take notes during meetings with the CARDS promoters. They did not read the CARDS transaction documents but merely signed the signature pages and had them faxed from Mr. Goodman's office. Because they did not read the transaction documents, Mr. Kerman testified that he did not know that the proceeds of the loan had to remain at HVB or that he waived his right of subrogation against Colindale.

As new clients of HVB, petitioners had to be approved by the bank as clients before they could proceed with the CARDS

transaction.  There is no evidence of any negotiations between petitioners and Colindale as to the terms of the loan or which party would make the principal or interest payments.  The CARDS promoters were responsible for structuring the financing arrangements of the CARDS transaction, including arranging a source of funds and negotiating with the funding institution the terms and conditions of the funding.

Another business purpose alleged by petitioners was to provide working capital for Kenmark while keeping the debt off Kenmark's books.  This business purpose is not credible.  Mr. Shields, chief financial officer of Kenmark, testified that Kenmark had almost reached its credit limit with National City Bank in the years immediately preceding the CARDS transaction and needed additional resources for a new Vera Wang line of eyewear that the company was considering adding.  According to Mr. Shields, for the first year of the Vera Wang contract Kenmark expected to spend $500,000 to $1 million on advertising and $200,000 to $1 million for the product itself.

Contrary to Mr. Shields' and Mr. Kerman's testimony, Kenmark had a line of credit with National City Bank that was more than sufficient to cover the expected costs of adding the Vera Wang line.  As of August 31, 2000, Kenmark had drawn only $4,725,000 of its $12 million line of credit with National City Bank. Kenmark's loan balance increased an additional $1,450,000 to

$6,175,000 on August 31, 2001, and an additional $1,325,000, to $7,500,000, a year later. The additional borrowing demonstrates that Kenmark had ready access to working capital from its bank. Further, petitioners personally guaranteed Kenmark's $12 million line of credit with their $12 million net worth, so Kenmark could have drawn the entire $12 million had it needed funds. If Kenmark really could not have obtained additional financing from National City Bank, petitioners could have sought other means of financing. However, there is no evidence that they explored other financing options for Kenmark during 2000 and 2001.

There is no evidence in the record of how Colindale could have used the loan proceeds to pursue any investment program that would be expected to generate a profit. HVB did not face any of the traditional risks associated with lending, including interest-rate risk, credit/default risk, foreign exchange risk, and liquidity risk because the CARDS loan proceeds remained either in HVB or under its control.

C. Country Pine Finance

In Country Pine Finance, L.L.C. v. Commissioner, T.C. Memo. 2009-251, losses were disallowed in a CARDS transaction funded by another bank because the CARDS transaction "lacked economic substance". In the opinion of the Court, the transaction lacked economic substance because it "consisted of prearranged steps entered into to generate a tax loss; the loan proceeds were never

at risk and the transaction giving rise to the tax loss was cashflow negative."

Petitioners' CARDS transaction is almost identical to the transaction in Country Pine Finance. Both CARDS transactions had no practical economic effect other than the creation of income tax losses for petitioners. Petitioners recognized a large gain, in the approximate amount of $5.4 million, on the sale of Kenmark stock and sought ways to offset that gain. The CARDS transaction was developed by Chenery and involved a special-purpose limited liability company, Colindale, acting as the borrower. Colindale was formed solely for the CARDS transaction and had the same members as did Fairlop Trading in Country Pine Finance, United Kingdom citizens and residents Elizabeth A.D. Sylvester and Michael Sherry.

Like Country Pine Finance, the bank and the L.L.C. entered into a credit agreement whereby Colindale was required to pledge collateral in order to borrow from HVB. Like Country Pine Finance, petitioners exchanged their portion of the loan proceeds, euro, for dollars and completed the exchange within days of signing the assumption agreement. Like Country Pine Finance, less than a year after the bank and the L.L.C. entered into the credit agreement, the bank informed the other parties that it was no longer willing to maintain the loan. Like Country Pine Finance, Colindale's sole purpose was effecting the CARDS

transaction and dissolving less than a year after the transaction ended.  The fees paid to accommodating parties in connection with CARDS were not standard banking or financial fees but were based upon the amount of the loan and tax loss created and dependent upon the assumption of the loan.  Like Country Pine Finance, petitioners claimed a tax basis in 100 percent of the loan, here $5 million, a sale price of $750,000, and a loss of $4,251,389, which included $1,389 in amortized transaction costs.  The CARDS transaction lacked economic substance.  Petitioners did not have a nontax business purpose for entering into the CARDS transaction.  Because we find that the CARDS transaction lacked economic substance, it is disregarded for tax purposes and petitioners' claimed loss is disallowed.

## VI.   Accuracy-Related Penalty

Under section 6662(a) and (b), a taxpayer may be liable for a penalty of 20 percent on the portion of an underpayment which is attributable to, among other things, a substantial understatement of income tax, a substantial valuation misstatement, or negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of internal revenue laws. Sec. 6662(c).  The term "disregard" includes any careless, reckless, or intentional disregard.  Id.

A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return, or $5,000. Sec. 6662(d)(1)(A). The term "understatement" means the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). The amount of the "understatement" is reduced by that portion of the understatement which is attributable to:  (1) The tax treatment of any item if there is or was substantial authority for such treatment; or (2) any item if the relevant facts affecting the item's tax treatment are adequately disclosed in the return or, in a statement attached to the return, and there is a reasonable basis for the tax treatment of such item by the taxpayer. Sec. 6662(d)(2)(B).

However, this reduction does not apply to any item attributable to a "tax shelter", which is defined as a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. Sec. 6662(d)(2)(C). There is a substantial valuation misstatement if, among other things, the value or adjusted basis of any property claimed on any return is 200 percent or more of the amount determined to be the correct amount of such value or adjusted basis. Sec. 6662(e)(1)(A). If

the value or adjusted basis of any property claimed on a return is 400 percent or more of the amount determined to be the correct amount of such value or adjusted basis, the valuation misstatement constitutes a "gross valuation [misstatement]". Sec. 6662(h)(2)(A). If there is a gross valuation misstatement, then the 20-percent penalty under section 6662(a) is increased to 40 percent. Sec. 6662(h)(1) and (2)(A); Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288.

One of the circumstances in which a valuation misstatement may exist occurs when a taxpayer's claimed basis is disallowed for lack of economic substance. Illes v. Commissioner, 982 F.2d 163 (6th Cir. 1992); New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. 161 (2009), affd. without published opinion 106 AFTR 2d 2010-7116, 2010-2 USTC par. 50,740 (6th Cir. 2010). In the Court of Appeals for the Sixth Circuit, where a transaction is disallowed for lack of economic substance and the artifice of the transaction was constructed on the foundation of the overvaluation of assets, the valuation overstatement penalty applies. See Illes v. Commissioner, supra at 167.

The accuracy-related penalty may not be imposed with respect to an underpayment if the taxpayer's actions regarding it can be justified by reasonable cause and the taxpayer acted in good faith. Sec. 6664(c)(1). Reasonable cause and good faith are determined on a case-by-case basis, taking into

account all pertinent facts and circumstances.  New Phoenix Sunrise Corp. & Subs. v. Commissioner, supra at 192; sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor in determining reasonable cause and good faith is the extent of the taxpayer's effort to assess his proper tax liability. Kolbeck v. Commissioner, T.C. Memo. 2005-253; sec. 1.6664-4(b)(1), Income Tax Regs.

One application of the exception is to a taxpayer's reasonable reliance in good faith on the advice of an independent professional adviser as to the tax treatment of an item.  Menard, Inc. v. Commissioner, T.C. Memo. 2004-207 (citing United States v. Boyle, 469 U.S. 241, 250 (1985)), revd. on other grounds 560 F.3d 620 (7th Cir. 2009)); sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer must show that:  (1) The adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Menard, Inc. v. Commissioner, supra (citing Sklar, Greenstein & Scheer, P.C. v. Commissioner, 113 T.C. 135, 144-45 (1999)).

The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other

person.  For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner.  Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

"A taxpayer is not reasonable * * * in relying on an adviser burdened with an inherent conflict of interest about which the taxpayer knew or should have known."  Am. Boat Co., LLC v. United States, 583 F.3d 471, 481-482 (7th Cir. 2009) (citing Neonatology Associates., P.A. v. Commissioner, 299 F.3d 221, 234 (3d Cir. 2002), affg. 115 T.C. 43 (2000), Chamberlain v. Commissioner, 66 F.3d 729, 732-733 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228, Pasternak v. Commissioner, 990 F.2d 893, 902 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181, and Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP, 623 F. Supp. 2d 504, 511 (S.D.N.Y. 2009)).

"[W]hen an adviser profits considerably from his participation in the tax shelter, such as where he is compensated through a percentage of the taxes actually sheltered, a taxpayer is much less reasonable in relying on any advice the adviser may provide."  Am. Boat Co., LLC v. United States, supra at 482. "'In order for reliance on professional tax advice to be reasonable * * * the advice must generally be from a competent

and independent advisor unburdened with a conflict of interest and not from promoters of the investment.'" New Phoenix Sunrise Corp. & Subs. v. Commissioner, supra at 193 (quoting Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), affg. T.C. Memo. 2004-279).

Reliance on the professional advice of a tax shelter promoter is unreasonable when the advice would seem to a reasonable person to be "too good to be true". Edwards v. Commissioner, T.C. Memo. 2002-169 (citing Pasternak v. Commissioner, supra at 903, Elliott v. Commissioner, 90 T.C. 960, 974 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990), and Gale v. Commissioner, T.C. Memo. 2002-54, affd. 119 Fed. Appx. 293 (D.C. Cir. 2005)).

Petitioners reviewed the CARDS promotional materials, all of which focus on the tax consequences of the transaction. The materials describe the steps of a CARDS transaction exactly as petitioners' transaction was executed and included a statement that the "Lender is the custodian of and receives a security interest in the collateral." The materials also state that the transaction can be structured to generate ordinary or capital losses and that "if ordinary losses are desired, the borrowing is denominated in a non-United States currency." The promotional materials warn that the IRS might challenge the transaction, and that "the tax law requires taxpayers to possess a business

purpose and a transaction to have economic substance to be respected for federal income tax purposes."

IRS Notice 2000-44, 2000-2 C.B. 255, which is included in the CARDS promotional materials, contains the statement that tax losses from transactions similar to CARDS that are designed to produce noneconomic tax losses by artificially overstating basis are not allowable as deductions for Federal income tax purposes. The materials also alert potential assuming parties that the IRS may determine that the CARDS transaction results in an unintended tax benefit to the assuming party. Petitioners understood that they were an assuming party. The promotional materials also state that an assuming party includes the entire face amount of the loan proceeds in its tax basis and that the value of the loan proceeds is only 15 percent of the loan. The materials further explain that a tax loss of approximately 85 percent of the loan results when the foreign currency is converted into United States dollars and that "the taxpayer claims a tax loss * * * even though the taxpayer has incurred no corresponding economic loss." The materials contain the caveat that the existence of a nontax business purpose is a requirement for participating in the transaction and that the tax treatment assumes that the investor expects to earn a return on the use of the loan proceeds in excess of the all-in cost of the loan.

Petitioners knew, or should have known, that any advice they received from Chenery or anyone associated with Chenery was not independent because Chenery stood to benefit from the promotion of the CARDS transaction. They came into contact with Chenery and its associates because petitioners were looking for a way to mitigate their large capital gain and considering tax savings strategies due to the sale of the Kenmark shares. Chenery was responsible for structuring the financing arrangements of petitioners' CARDS transaction including arranging a source of funds; negotiating with the funding institution, HVB, the terms and conditions of the funding; and providing a tax opinion. Chenery received a $500,000 fee based on the amount of the loss generated for petitioners. Any advice from Chenery or any of its associates was burdened with an inherent conflict of interest.

Petitioners did not read any of the CARDS transaction documents but provided them to Mr. Shields to review. Although they claimed to have relied on advice from Mr. Gibbs and Louis T. Roth & Co., the accounting firm, neither provided them with a written tax opinion for the CARDS transaction. Petitioners could not have reasonably relied upon any other advice given by Mr. Gibbs as they did not provide necessary and accurate information to him. This is evidenced by the fact that Mr. Gibbs did not know the most basic facts about petitioners' CARDS transaction, such as the amount of U.S. dollars petitioners were credited with

when the €855,000 was exchanged.  Instead of fully disclosing the facts concerning the CARDS transaction to Mr. Gibbs, Mr. Kerman testified that he did not know but assumed that Mr. Gibbs saw the CARDS transaction documents.  Mr. Gibbs evidently relied on the promotional materials and a tax opinion prepared by Brown & Wood, a law firm, in completing petitioners' 2000 income tax return and in advising petitioners.

Mr. Kerman also testified that he was not sure but assumed that Mr. Goodman saw the CARDS promotional materials.  It appears that Mr. Goodman did see the CARDS materials, because he asked Mr. Stone some questions about the transaction.  Mr. Goodman gave petitioners no written opinion with respect to petitioners' CARDS transaction.  Petitioners estimated that they paid fees to Mr. Goodman in an amount between $10,000 and $15,000 to review the transaction but did not provide copies of Mr. Goodman's bills.

Petitioners also could not have reasonably relied upon the tax opinion provided by R.J. Ruble (Mr. Ruble), a partner with Brown & Wood.  Before petitioners entered into the CARDS transaction, Mr. Hahn and Mr. Stone assured them that they would receive a tax opinion from Brown & Wood that would ensure they would not be liable for tax penalties if the CARDS transaction was determined to be an invalid tax shelter.  Petitioners knew that Mr. Ruble and Brown & Wood were working together with the

CARDS promoters. They also knew, or should have known, that the Brown & Wood opinion was not independent advice and that Mr. Ruble had an inherent conflict of interest.

Mr. Hahn and Mr. Stone also promised petitioners that they would receive benefits from the CARDS transaction when filing their tax returns. Petitioners relied on the representation of the CARDS promoters that the CARDS transaction would earn a return on investment that exceeded the $500,000 cost of the transaction and that it was a sound business transaction with tax advantages. Petitioners assumed they could earn a profit on their portion of the loan proceeds. While Mr. Shields testified that he spoke with Mr. Ruble and Mr. Goodman about several of the CARDS transaction documents, he admitted that they merely discussed that the various documents were consistent with the transaction as presented to him and to petitioners. Mr. Shields never testified that he spoke with either Mr. Ruble or Mr. Goodman about the tax treatment of the CARDS transaction.

The tax opinion states that Chenery is the arranger of the CARDS transaction, developed the structure, identified the LLC and its members, negotiated the credit facility with the bank, arranged for the transaction's documentation, and presented completed financing to petitioners for evaluation and assumption. The tax opinion discloses that Chenery would receive an investment banking fee from petitioners and that Colindale would

receive a fee for incurring the loan. The final version of Brown & Wood's tax opinion was identical to the draft provided to petitioners by the CARDS promoters before the transaction. Consequently, they must have known that the CARDS transaction was not unique to their situation but was instead a transaction for taxpayers seeking tax losses.

Further, Mr. Kerman admitted that he did not select Brown & Wood as the law firm to provide the tax opinion and that he had met neither Mr. Ruble nor any attorney at Brown & Wood. There is no evidence showing that petitioners had an engagement letter with, directly paid any fees to, or ever spoke to anyone at Brown & Wood. Although the Credit Agreement and the Purchase Agreement clearly state that Brown & Wood was Colindale's legal counsel in connection with petitioners' CARDS transaction, Mr. Kerman denied knowing that fact.

The Brown & Wood tax opinion contains several misstatements, and petitioners admitted that the representations in the tax opinion are false and fraudulent. It states that the assets were released to petitioners when they purchased them and that they provided substitute collateral. As discussed above, petitioners never received any of the loan proceeds and never substituted collateral. Additionally, the tax opinion states that petitioners sold the assets on December 28, 2000, even though they actually exchanged portions of the euro on December 22 and

27, 2000.  The tax opinion states that petitioners represented that they had reviewed the transaction summary in the tax opinion and that it was "accurate and complete".  However, Mr. Kerman testified that he never reviewed the transaction summary.

Mr. Kerman represented that he reasonably believed that the assets, or the proceeds from the sale, could be used to generate a return that would exceed "by more than a de minimis amount the all-in cost of borrowing", including fees and costs paid to third parties "and without regard to Federal income taxes".  However, as discussed above, he had no purpose to use the loan proceeds, so this representation is false.  Petitioners also represented that every transaction described in the tax opinion actually occurred, when it is obvious from the record that the actual CARDS transaction differed from that represented.  The tax opinion concludes with a statement that Brown & Wood did not independently verify the representations and documents for the CARDS transaction; and if they were inaccurate in any material respect, the tax opinion could not be relied upon.

Petitioners did not read the Brown & Wood tax opinion. Petitioners cannot rely on an opinion that they knew, or should have known, came from a law firm with an inherent conflict of interest and that contained blatantly false representations.

Lucy Kerman has a college degree in physical therapy.  Mr. Kerman founded Kenmark in 1972 and developed it into a successful

business.  He was in charge of Kenmark from its inception through 2001, was its chairman and CEO in 2000, and is currently its chairman of the board.  In 2000 Kenmark's sales were approximately $34 million.  Petitioners became multimillionaires as a result of Mr. Kerman's efforts with Kenmark and had a net worth of $12.66 million as of November 30, 2000.

In general, Mr. Kerman testified that he had no knowledge or understanding of the CARDS transaction.  He did not read, review, or remember the documents executed as part of the CARDS transaction.  He was either not familiar with or had only a superficial recollection of Mr. Hahn, Chenery, Colindale, and HVB and its affiliates.  As Mr. Cohen testified, it is obvious that Mr. Kerman was motivated by the tax aspects of the CARDS transaction.  To believe Mr. Kerman's story, one must believe that he paid over $600,000 in fees and costs to receive "financing" of $784,750.  As a capable businessman and prudent investor, Mr. Kerman knew or should have known that the CARDS transaction was just too good to be true.

We find petitioners are liable for the 40-percent gross valuation misstatement penalty.  The correct cost basis of the foreign currency credited to petitioners' balance is $784,750, not $5 million as reported on petitioners' 2000 income tax

return.[5]  Therefore, the basis misstatement satisfies the gross valuation [misstatement] threshold pursuant to section 6662(h)(1).

VII.  Conclusion

The CARDS transaction lacked economic substance and stood no chance of earning a profit.  The members did not have a nontax business purpose for entering into the CARDS transaction.  Because we find that the CARDS transaction lacked economic substance, it is disregarded for tax purposes and petitioners' claimed loss is disallowed.  Petitioners have failed to establish reasonable cause for the gross misstatement in the value of the basis of the foreign currency used in the CARDS transaction.

To reflect the foregoing,

Decision will be entered

for respondent.

---

[5]Going from $784,750 to $5 million is a 530 percent increase.