T.C. Memo. 2011-195

UNITED STATES TAX COURT

WILLIAM E. GUSTASHAW, JR. AND NANCY D. GUSTASHAW, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19668-06.                    Filed August 11, 2011.

<u>Held</u>:  Ps, who concede deficiencies in tax
attributable to PH's participation in a Custom
Adjustable Rate Debt Structure (CARDS) transaction, are
liable for accuracy-related penalties for gross
valuation misstatements or, for 1 year, negligence, on
account of resulting underpayments in tax.

<u>William P. Gregory</u>, for petitioners.

<u>Stephen R. Takeuchi</u> and <u>Robert W. Dillard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency (the notice), respondent determined deficiencies in, and accuracy-related penalties with respect to, petitioners' Federal income tax as follows:[1]

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|-----------|
| 2000 | $3,188,225 | $1,275,290 |
| 2001 | 159,775 | 31,955 |
| 2002 | 85,648 | 17,130 |
| 2003 | 4,492 | 898 |

By amendment to answer to amended petition, respondent increased by $31,955 and $17,130 the accuracy-related penalties he had determined for 2001 and 2002, respectively, for total section 6662(a) penalties for those years of $63,910 and $34,260, respectively.  Taking into account both parties' concessions,[2] the only issue for decision is whether petitioners are liable for the accuracy-related penalties of $1,275,290, $63,910, $34,260,

---

[1]Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all amounts to the nearest dollar.

[2]In the answer to amended petition, respondent asserted an increased deficiency and a corresponding increased sec. 6662 penalty for 2001, should the Court ultimately disregard respondent's 2000 deficiency determination.  Petitioners subsequently conceded the deficiencies for all of the years in issue.  As a result, respondent conceded the increased deficiency and accuracy-related penalty claims for 2001 asserted in the answer to amended petition.

and $898 for 2000, 2001, 2002, and 2003, respectively (the years in issue).

FINDINGS OF FACT

Introduction

Some facts are stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the second supplemental stipulation of facts, and the third supplemental stipulation of facts, with accompanying exhibits, are incorporated herein by this reference.

At the time they filed the petition, petitioners lived in Florida.

Background

William and Nancy Gustashaw married in 1971. Two years later, Mr. Gustashaw (sometimes, petitioner[3]) graduated from Gannon University with a bachelor of science degree in industrial management. While pursuing his degree, he took various business management courses, including courses in managerial cost accounting and the principles of accounting.

From 1973 to 1993, petitioner held management positions with various companies in the food and beverage industry. In 1994, he

---

[3]The accuracy-related penalty at issue arose from a transaction entered into by Mr. Gustashaw and reported on petitioners' 2000 joint Federal income tax return. The parties' arguments, therefore, focus on Mr. Gustashaw's evaluation and reporting of the transaction for Federal income tax purposes. Accordingly, hereafter, when referring to him alone, we sometimes refer to Mr. Gustashaw as petitioner.

entered the pharmaceutical industry, joining Merck Medco Managed Care (Merck Medco) as vice president of operations, responsible for large-scale prescription processing in a mail-order pharmacy, before being promoted to vice president and general manager responsible for all operations of two of its mail-order pharmacies. During his employ by Merck Medco, he received stock options.

Petitioner's Retirement Plans

Petitioner wished to retire at the age of 50. In 1995, at the age of 45, he began to plan for his retirement. He expected to exercise the majority of his Merck Medco stock options in 1999, or 2000, and, although he had handled almost all of his and Mrs. Gustashaw's investment decisions throughout their marriage, petitioner sought a financial planner to determine whether the stock option exercise would generate enough income to fund their retirement.

Petitioner and Mrs. Gustashaw hired Ralph Maulorico (Mr. Maulorico), a financial planner at New England Financial. In 1996, upon Mr. Maulorico's recommendation, petitioner exercised some of his stock options, selling the acquired stock and investing the proceeds in mutual funds.

For all years during their marriage, until 2000, Mr. Gustashaw prepared petitioners' joint Federal income tax returns. In 1997, however, petitioners decided to hire a tax accountant

(initially, only to review petitioners' returns, which Mr. Gustashaw would continue to prepare). Mr. Maulorico recommended his college friend, William Gable (Mr. Gable). Mr. Gable is an enrolled agent and an accountant, although not a certified public accountant. He owns an accounting practice in Florida and received both an undergraduate and a master's degree in accounting, the latter with a specialty in taxation, at LaCrosse University. Mr. Gable reviewed petitioners' self-prepared joint returns for 1997-99 before they filed them.

The CARDS Transaction

In 1999, Merck Medco underwent a reorganization and offered petitioner the option to retire early. He accepted and retired that same year. In 2000, petitioner exercised his remaining Merck Medco stock options and sold the acquired stock, generating $8,077,376 of income.

That same year, Mr. Maulorico learned of the Custom Adjustable Rate Debt (sometimes, Custom Adjustable Rate Debt Structure; hereafter, without distinction, CARDS) transaction from a colleague and suggested it to petitioner as a possible investment opportunity because of what he thought to be both its profit potential and its ability to shelter the 2000 stock option exercise income. Chenery Associates, Inc. (Chenery), promoted

and arranged the CARDS transaction.  Petitioner consulted with Roy Hahn (Mr. Hahn), a certified public accountant and the founder of Chenery, to learn more about the transaction.

The transaction works as follows.[4]  A newly formed Delaware limited liability company (L.L.C.), owned 100 percent by nonresident alien individuals, enters into a credit agreement with a European financial institution (bank) under which the bank extends to the L.L.C. a loan for a term of 30 years with interest payments (but not principal payments) due, generally, annually. The loan may be denominated in either U.S. or European currency (i.e., dollars or euro).  The interest rate is set at the London Interbank Offered Rate (LIBOR) plus 50 basis points for the first interest period and reset annually.  The bank deposits the loan proceeds directly into the L.L.C.'s account at the bank.

The L.L.C. invests 85 percent of the deposited proceeds in Government bonds and uses the remaining 15 percent to make a short-term time deposit, all of which the L.L.C. pledges as collateral for the loan.  To withdraw the loan proceeds, the

---

[4]We provide only a summary description of the CARDS transaction herein because it is virtually identical to the transaction more fully described in Kerman v. Commissioner, T.C. Memo. 2011-54.

L.L.C. must provide substitute collateral, which it could do, at the bank's discretion,[5] at each annual interest reset date.

If the bank chooses not to maintain the loan for the upcoming interest period, its rejection constitutes delivery to the L.L.C. of a "Mandatory Prepayment Election Notice", which requires repayment of the loan at the end of the current interest period. The L.L.C. may repay the loan at any time after the first year.

Upon the short-term time deposit's maturity, the L.L.C. and the taxpayer involved (the taxpayer) enter into an agreement whereby the L.L.C. transfers the deposit's proceeds, representing 15 percent of the entire loan amount, to the taxpayer in exchange for his assumption of joint and several liability for the L.L.C.'s obligations to the bank, including repayment of the entire loan. The L.L.C. and the taxpayer agree that, as between them, the taxpayer would repay the unpaid principal amount[6] of the loan at maturity and the L.L.C. would retain all interest obligations.

The deposit's proceeds (the taxpayer's portion of the loan proceeds) are credited to his deposit account maintained at the

---

[5]The L.L.C. could also request, at that time, a change to the loan terms, such as to amount or maturity.

[6]The amount due would equal the present value of the loan's principal amount, which amounts to 15 percent of the loan principal.

bank.  Once transferred from the L.L.C.'s pledged account, the proceeds no longer collateralize 15 percent of the loan, which requires the taxpayer to pledge to the bank, as collateral, all of his holdings at the bank, including the deposit account holding his portion of the loan proceeds.

The taxpayer may, at the bank's discretion, withdraw his portion of the loan proceeds after providing substitute collateral on at least a dollar-for-dollar basis.  At each annual interest reset date, the L.L.C. may allow the taxpayer to purchase additional portions of the loan proceeds, up to the full principal amount of the loan.[7]

According to Mr. Hahn, upon converting his portion of the euro-denominated loan into dollars or selling the Government securities in the market, the taxpayer would generate a permanent tax loss of approximately 85 percent of the entire loan amount (the loan from the bank to the L.L.C.).  Mr. Hahn further explained that the taxpayer's only out-of-pocket expense for the entire transaction is an investment banking fee, equal to a percentage of the entire loan amount, payable to Chenery to arrange the transaction.

---

[7]In addition, petitioner believed that upon the loan's maturity, the taxpayer could pay the unpaid principal amount of the loan in either dollars or euro.

Petitioner's Investigation of the CARDS Transaction

As discussions with Mr. Hahn progressed, petitioner became interested in the transaction because he understood that it gave him: (1) The potential to generate a tax loss in the first year sufficient to eliminate petitioners' entire 2000 joint tax liability, (2) access to a large pool of funds, not usually available to individuals, for investment over a 30-year period, and (3) the ability to leverage the euro against the dollar after the first year by drawing down a euro-denominated loan and repaying the loan in dollars if the euro was valued lower than the dollar at maturity.

In June 2000, petitioner met with Mr. Maulorico and Mr. Gable to discuss the transaction and review the CARDS executive summary, a program overview prepared by Mr. Hahn. After the meeting, Mr. Maulorico "anecdotally" reviewed the transaction's economics and concluded that, on the basis of past Standard & Poor compound annual returns, it would be profitable to finance long-term investments with the CARDS transaction's line of credit, promising petitioner that he could make "16 percent on your [petitioner's] money". Mr. Maulorico did not accompany his conclusions with a written analysis. Petitioner did not contact other banks to see whether they offered a similar credit arrangement.

Mr. Gable, meanwhile, asked Mr. Hahn about obtaining a tax opinion letter regarding the transaction's Federal income tax consequences. Mr. Gable had felt uncomfortable opining on the transaction's tax ramifications, specifically whether the transaction would indeed generate a permanent tax loss, as assured by Mr. Hahn, because the transaction invoked provisions of the Internal Revenue Code with which he was unfamiliar. Having been asked to prepare petitioners' 2000 joint Federal tax return, Mr. Gable refused to prepare, and take a permanent loss tax position on, the return without a tax opinion letter supporting the position.

Mr. Hahn offered to provide to petitioner a model tax opinion letter from the law firm of Brown & Wood LLP (Brown & Wood). Chenery had retained Brown & Wood to produce a tax opinion letter when it first developed the CARDS transaction, and the law firm "stood available" to write tax opinion letters for future CARDS participants.

Mr. Gable informed petitioner of Mr. Hahn's offer, stating that a tax opinion letter from a major law firm, such as Brown & Wood, concluding that the CARDS transaction would more likely than not withstand an Internal Revenue Service (IRS) examination would protect petitioner from substantial tax penalties if the transaction was ultimately disregarded for Federal tax purposes. Petitioner asked to see a model tax opinion letter.

Chenery provided the model tax opinion letter shortly thereafter, and petitioner met with Mr. Maulorico and Mr. Gable to review its conclusions. The letter, which assumed that the loan would be denominated in euro, stated that the CARDS transaction "has not been before a court of law addressing the issues addressed herein". It concluded, however, that on the basis of authority in analogous contexts, it is more likely than not that: (1) The transaction (the transfer of the euro-denominated deposit proceeds to the CARDS participant (participant) in exchange for his assumption of the L.L.C.'s obligations to the bank) would constitute a sale of the foreign currency (assets) by the L.L.C. to the participant, (2) the participant's tax basis in the assets would equal the principal amount of the loan (the amount of the L.L.C.'s liability to the bank that the participant assumed) plus the amount of cash and the fair market value of any other consideration paid, (3) any gain or loss recognized upon the assets' disposition would be characterized as ordinary gain or loss under section 988, and (4) the participant would recognize no income upon the L.L.C.'s repayment of the loan to the bank.

Despite the fact that the model tax opinion letter was provided by the transaction's promoter, Mr. Gable viewed it as an "honest opinion of the viability of this transaction" because Brown & Wood was a reputable and "major law firm". At Mr.

Gable's insistence, petitioner requested that Brown & Wood provide him with a formal tax opinion letter. Because he viewed a second formal tax opinion letter as superfluous, and considering the substantial cost of obtaining it, Mr. Gable advised petitioner against obtaining such a letter from a second tax professional. Petitioner heeded that advice, in part because of Mr. Gable's statement that Brown & Wood had "expertise in this area of foreign transactions".

Petitioner was aware that the transaction's tax ramifications were untested, but he did not seek either a ruling from the IRS on the tax consequences or an opinion regarding the legality, not merely the tax consequences, of the transaction. Instead, he relied on the "credibility" of Mr. Hahn and Brown & Wood, as reported to him by Mr. Gable and Mr. Maulorico.

On July 6, 2000, petitioner asked Mr. Gable, among other things, to: (1) Determine petitioners' estimated 2000 tax liability, including the income from the Merck Medco stock options exercise, (2) prepare a CARDS investment schedule to create a loss sufficient to offset petitioners' 1998, 1999, and 2000 tax liabilities, (3) prepare a schedule of rates of return, using reasonable return assumptions, to offset the program's cost and any interest charged by the IRS if generated deductions were disallowed, and (4) complete the program's after-tax cost using reasonable rates of return if generated deductions were

disallowed because of the transaction's untested tax ramifications.

Mr. Gable's report, dated August 18, 2000, examined the requested scenarios using exclusively information provided by Mr. Hahn.  The report assumed that the CARDS transaction would terminate, prompting the loan's repayment, on April 30, 2004, a date outside the period of limitations for examination of petitioners' 2000 joint Federal income tax return.  In calculating the earnings generated on tax refunds, Mr. Gable assumed that all tax refunds would be received by June 30, 2001.

Petitioner's CARDS Participation

Petitioner sent a letter to Chenery, dated October 5, 2000, agreeing to pay it an $800,000 investment banking fee and enclosed a $10,000 downpayment towards the fee, the balance of which was to be paid upon the loan's termination. Notwithstanding the $10,000 payment, petitioner remained under no obligation to participate in the CARDS transaction.

After receiving petitioner's letter, Chenery arranged the CARDS facility, identifying Bayerische Hypo- und Vereinsbank AG (HVB), a German bank, as lender and Osterley Financial Trading LLC (Osterley), a newly formed Delaware L.L.C. wholly owned by two nonresident alien individuals, as the initial borrower.

On December 5, 2000, HVB entered into an agreement with Osterley whereby it extended a €12,900,000 loan to Osterley under

the earlier described terms.  Petitioner received a letter from HVB, dated December 21, 2000, confirming his interest in assuming joint and several liability for the euro-denominated loan to Osterley.  The letter stated that HVB "makes no guarantee or representation whatsoever as to the expected performance or results of the Transaction (including the legal, tax, financial or accounting consequences thereof)" and that petitioner represents that he has been "independently advised by" his own legal counsel and will comply with the Federal internal revenue laws.

On December 21, 2000, petitioner executed the documents to participate in the transaction.  He read the documents before signing them but did not fully understand them.  Petitioner did not have an attorney review the documents before executing them, assuming most of the language to be boilerplate and the documents merely to formalize his discussions with Mr. Hahn.  Petitioner considered the transaction legitimate, believing that Brown & Wood and HVB, a reputable law firm and a major bank, respectively, would not engage in illegitimate transactions. Neither Mr. Gable nor Mr. Maulorico reviewed the transaction documents.  The transaction documents did not provide a euro-dollar conversion opportunity during the first year, and the purchase agreement between petitioner and Osterley stated that

Brown & Wood acted as U.S. counsel to Osterley in the transaction.

On December 22, 2000, HVB released as collateral under the loan €1,577,778 of petitioner's €1,935,000 portion of the loan's proceeds, which petitioner converted to $1,448,400. On December 27, 2000, HVB released the remaining portion, €357,222, which petitioner converted to $332,216 on December 29, 2000. Although released, the money remained in petitioner's account at HVB.

Petitioner received Brown & Wood's formal tax opinion letter, dated December 31, 2000, and signed by "Brown & Wood LLP", which arrived at the same "more likely than not" conclusions as the model tax opinion letter. He did not compensate Brown & Wood for either tax opinion letter; Chenery paid the law firm out of the $800,000 fee owed to it by petitioner. Petitioner did not know how much Brown & Wood was ultimately paid for its services.

Mr. Gable reviewed the formal tax opinion letter and read the cited Internal Revenue Code sections but did not independently consider whether they, or the cited caselaw, supported the opinion letter's conclusions because he did not doubt that they were correct.

Wishing to access the loan proceeds (which he had converted from euro to dollars), on April 2, 2001, petitioner pledged substitute collateral, and HVB wired out of his HVB account a

portion of the previously released loan proceeds.  The value of the collateral soon became deficient, however, and, upon HVB's request, petitioner pledged additional substitute collateral to cover the shortfall.

On November 13, 2001, HVB issued to petitioner a Mandatory Prepayment Election Notice, notifying him that the bank was calling in the loan and the entire outstanding principal amount of the loan, including any interest accrued, would be due and payable as of December 5, 2001.  Mr. Maulorico asked Mr. Hahn whether another bank would provide the same credit arrangement; all banks declined.  On December 17, 2001, the CARDS transaction was terminated, with all debts satisfied.

Petitioners' Joint Federal Income Tax Returns for 2000, 2001, 2002, and 2003

Petitioners filed a joint Form 1040, U.S. Individual Income Tax Return, for tax year 2000.  Mr. Gable prepared the tax return and reviewed it with petitioners.  Form 4797, Sales of Business Property, attached to the Form 1040, reported the CARDS transaction generally in the following terms:  On December 5, 2000, petitioners acquired property in a foreign currency transaction pursuant to section 988 at a cost or other basis of

$11,739,258,[8] and they sold it, on December 21, 2000, for $1,800,934,[9] generating an ordinary loss of $9,938,324. Mr. Gable relied on Mr. Hahn to calculate the amounts reported on Form 4797.

The claimed ordinary loss offset all of petitioners' reported income for 2000, resulting in $1,784,462 of negative adjusted gross income. Petitioners claimed net operating loss carryforward deductions related to the CARDS transaction of $1,231,106, $785,986, and $498,860 on their joint 2001, 2002, and 2003 Forms 1040, respectively.

Respondent's Examination

Respondent examined petitioners' joint Forms 1040 for the years in issue. He disallowed the $9,938,324 loss claimed on the 2000 tax return on the grounds, among other, that petitioners failed to establish the claimed $11,739,258 basis and that the transaction lacked economic substance, "was entered into for the primary purpose of tax avoidance, and/or was prearranged and predetermined." Respondent also disallowed the 2001, 2002, and 2003 claimed net operating loss carryforward deductions because of his adjustments to petitioners' 2000 return. Finally,

---

[8]The reported amount represents the U.S. dollar equivalent of the €12,900,000 loan.

[9]The reported amount represents the U.S. dollar equivalent of Mr. Gustashaw's collateralized 15-percent share.

respondent determined an accuracy-related penalty under section 6662(a) for each year in issue.

<u>HVB's Fraudulent Behavior</u>

On February 13, 2006, HVB entered into a deferred prosecution agreement with the U.S. Government in which it admitted that it participated in several tax shelter transactions, including CARDS, between 1996 and 2002 and that the CARDS transactions involved purported 30-year loans, when all parties, including the borrowers, knew that the transactions would be unwound in approximately 1 year so as to generate false tax benefits for the participants. HVB acknowledged that the transactions, therefore, had no purpose other than to generate tax benefits for the participants. HVB further admitted that it engaged in activities with others, including Brown & Wood, "related to the CARDS tax shelter with the intention of defrauding the United States."

Before trial, and in the light of HVB's admissions in the deferred prosecution agreement, petitioners conceded the deficiencies in income tax for all years in issue, leaving only the applicability of the accuracy-related penalty at issue. At trial, Mr. Gustashaw admitted that petitioners did not suffer a $9,938,324 economic loss associated with the $9,938,324 tax loss claimed on their 2000 Form 1040.

OPINION

## I.  Imposition of the Accuracy-Related Penalty

### A.  Introduction

Section 6662(a) imposes an accuracy-related penalty of 20 percent of the portion of an underpayment of tax attributable to, among other things, negligence or disregard of rules or regulations (without distinction, negligence), any substantial understatement of income tax, or any substantial valuation misstatement.  Sec. 6662(a) and (b)(1)-(3).  In the case of a gross valuation misstatement, the penalty is increased from 20 percent to 40 percent.  Sec. 6662(h)(1).  The accuracy-related penalty, however, does not apply to any part of an underpayment if it is shown that the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1).

The Commissioner bears the burden of production with respect to penalties.  See sec. 7491(c).  To meet this burden, he must produce evidence regarding the appropriateness of imposing the penalty.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001); Raeber v. Commissioner, T.C. Memo. 2011-39.  The taxpayer's concessions may be taken into account to meet this burden.  Oria v. Commissioner, T.C. Memo. 2007-226.  Once the Commissioner carries his burden, the burden of proof remains with the taxpayer, "including the burden of proving that the penalties are inappropriate because of reasonable cause."  Kaufman v.

<u>Commissioner</u>, 136 T.C. ___, ___ (2011) (slip op. at 47). The Commissioner, however, bears the burden of proof with respect to any increased penalty asserted in an amendment to answer. Rule 142(a).

Respondent determined the accuracy-related penalty, alternatively, upon all three of the above-referenced grounds for the years in issue. On brief, however, respondent states that he determined an accuracy-related penalty with respect to 2003 only on the ground of negligence. We construe that as a concession of other grounds for the penalty for 2003. See Rule 151(e)(4) and (5).

Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b). Sec. 1.6662-2(c), Income Tax Regs.

B. <u>Valuation Misstatement Penalty</u>

As stated above, section 6662(a) and (b)(3) imposes a penalty of 20 percent of the portion of an underpayment of tax attributable to a substantial valuation misstatement. A substantial valuation misstatement exists if the value, or adjusted basis, of any property claimed on a tax return is "200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis". Sec. 6662(e)(1)(A). If the valuation misstatement is 400 percent or more of the correct

amount, a gross valuation misstatement exists and the 20-percent penalty increases to 40 percent. Sec. 6662(h)(1) and (2)(A)(i). "The value or adjusted basis claimed on a return of any property with a correct value or adjusted basis of zero is considered to be 400 percent or more of the correct amount." Sec. 1.6662-5(g), Income Tax Regs. No penalty, however, is imposed unless the portion of the underpayment attributable to the valuation misstatement exceeds $5,000. Sec. 6662(e)(2).

Respondent argues that petitioners are liable for the 40-percent gross valuation misstatement penalty for taxable year 2000 because petitioners' claimed $9,938,324 loss resulted from reporting an $11,739,258 basis on their tax return, rather than the correct basis amount of zero. Respondent asserts that the underpayment resulting from the disallowed loss is, therefore, attributable to an overstatement of basis of 400 percent or more of the correct amount. In addition, he argues that the 40-percent penalty applies to the carryover of the loss attributable to the gross valuation misstatement to 2001 and 2002. See sec. 1.6662-5(c)(1), Income Tax Regs.

Petitioners argue that the valuation misstatement penalty is inapplicable as a matter of law because respondent's disallowance of their claimed loss in 2000 was attributable not to an overvaluation but rather to the CARDS transaction's lack of economic substance and, therefore, its nonexistence. Petitioners

assert that, as a result of HVB's fraudulent conduct, the transaction, in effect, never occurred. They argue that the disallowance, therefore, could not be attributable to an overvaluation of an asset because the asset never existed. In support of their argument, petitioners rely primarily on Keller v. Commissioner, 556 F.3d 1056 (9th Cir. 2009), affg. in part and revg. in part T.C. Memo. 2006-131, and Klamath Strategic Inv. Fund, LLC v. United States, 472 F. Supp. 2d 885 (E.D. Tex. 2007), affd. 568 F.3d 537 (5th Cir. 2009).

We have previously held the valuation misstatement penalty applicable where a transaction lacks economic substance and the underpayment results from disallowed deductions, credits, or losses computed with overvalued bases. See, e.g., Zirker v. Commissioner, 87 T.C. 970 (1986) (finding that section 6659, the predecessor of section 6662(a), applies where the transaction lacked economic substance and the underpayment was due to the disallowed deductions and credits caused by a finding of a zero adjusted basis). Indeed, in deciding cases factually similar to the instant case that were appealable to Courts of Appeals other than those for the Ninth and Fifth Circuits, we have expressly distinguished the reasoning of both Klamath and Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416, upon which Keller relies. See Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288 (finding Gainer

distinguishable because "[i]n Gainer, the court disallowed the claimed tax benefits on grounds independent from any alleged valuation misstatement" whereas in the case before the Court, the claimed inflated basis in the partnership interest directly contributed to the decision to disregard the transaction on economic substance grounds); LKF X Invs., LLC v. Commissioner, T.C. Memo. 2009-192, affd. in part and revd. in part without published opinion 106 AFTR 2d 2010-5003, 2010-1 USTC par. 50,488 (D.C. Cir. 2010); Panice v. Commissioner, T.C. Memo. 2007-110.

Petitioners offer no reason for us to deviate from our position, and we are not inclined to do so. Accordingly, we find the valuation misstatement penalty applicable in the instant case. We note that our holding is consistent with the views of many of the Courts of Appeals that have addressed this issue. See, e.g., Zfass v. Commissioner, 118 F.3d 184 (4th Cir. 1997), affg. T.C. Memo. 1996-167; Illes v. Commissioner, 982 F.2d 163 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991), affg. T.C. Memo. 1989-684; Massengill v. Commissioner, 876 F.2d 616 (8th Cir. 1989), affg. T.C. Memo. 1988-427.

With respect to the section 6662(h) penalty, respondent bears the burden of production for 2000 and, because he asserted the augmented penalty under section 6662(h) for 2001 and 2002 in the amendment to answer, the burdens of production and proof for

the augmented penalty for 2001 and 2002.  We find that respondent has satisfied those burdens.  On Form 4797, petitioners reported a basis of $11,739,258 in an asset that they purportedly later sold, resulting in a claimed $9,938,324 loss from the transaction.  In the notice, respondent determined a basis of zero, which petitioners effectively accepted as accurate in conceding all of the deficiencies in tax.  The basis claimed on the return exceeds the correct basis by 400 percent or more.  The underpayments determined for 2000, 2001, and 2002, each exceeding the $5,000 requirement of section 6662(e)(2) and caused by the disallowed loss and related carryover deductions, result directly from this overstatement.  See, e.g., Zirker v. Commissioner, supra.

Accordingly, petitioners are liable for the 40-percent accuracy-related penalty under section 6662(h) for tax years 2000, 2001, and 2002 unless they meet the section 6664(c) exception for reasonable cause and good faith.  Because of section 1.6662-2(c), Income Tax Regs., we need not address the applicability of the penalty upon the grounds of substantial understatement of income tax or negligence for 2000, 2001, and 2002.

C.  Negligence Penalty

Respondent contends that, for 2003, petitioners are liable for the 20-percent accuracy-related penalty under section 6662(a)

and (b)(1) because the 2003 underpayment resulting from the disallowed net operating loss carryover deduction was due to negligence.

Negligence is defined as a "lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances". Viralam v. Commissioner, 136 T.C. __, ___ (2011) (slip op. at 38). Negligence is strongly indicated where "[a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances". Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

A return position is not negligent, however, if it is reasonably based on certain enumerated authorities and is not a merely arguable or colorable claim. Sec. 1.6662-3(b)(1), (3), Income Tax Regs. Conclusions reached in opinion letters written by tax professionals are not considered authority, although "authorities underlying such expressions of opinion where applicable to the facts of a particular case" may provide reasonable basis for an item's tax treatment. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs.

Petitioners conceded that they improperly claimed the net operating loss carryover deduction on their joint 2003 Form 1040. Their concession is sufficient for us to conclude that respondent

has carried his burden of production. A reasonable and ordinarily prudent person would have considered as "too good to be true" a carryover deduction generated from a previously claimed $9,938,324 tax loss when he did not suffer an associated economic loss and invested only $800,000 in the transaction. As such, he would have conducted a thorough investigation before claiming the deduction on his tax return.

Petitioners, however, failed to do so. Mr. Gustashaw is college educated, has over 20 years of investment experience, and has competently prepared petitioners' joint Federal tax returns without the involvement of a tax professional for more than 20 years. Despite this experience, he did not attempt to understand the mechanics of the CARDS transaction, executed the transaction documents without reading them and without an attorney's review, and, although aware of the transaction's untested tax ramifications, declined to seek a ruling from the IRS. Further, he did not question the claimed carryover loss amount even though he knew that he did not suffer an associated economic loss. Such a "too good to be true" transaction required greater scrutiny. See, e.g., Viralam v. Commissioner, supra at __ (slip op. at 38-39).

Petitioners argue that they were not negligent because the legal authorities underlying the Brown & Wood tax opinion letter provided a reasonable basis for claiming the 2000 loss and thus

provided a reasonable basis for claiming, on their 2003 tax return, the related carryover deduction. See sec. 1.6662-3(b)(1), Income Tax Regs. We disagree. The tax opinion letter addresses the tax consequences of four independent transactions and presumes that the CARDS transaction is the amalgamation of these separate transactions. In reaching its four conclusions, the opinion letter cites authorities of the type set forth in section 1.6662-4(d)(3)(iii), Income Tax Regs. See sec. 1.6662-3(b)(3), Income Tax Regs. Although, piecemeal, the cited authorities support each individual conclusion, the authorities present factual situations that do not adequately describe the CARDS transaction as a whole. See sec. 1.6662-4(d)(3)(ii), Income Tax Regs. ("The weight accorded an authority depends on its relevance * * * . For example, a case or revenue ruling having some facts in common with the tax treatment at issue is not particularly relevant if the authority is materially distinguishable on its facts"). We, therefore, cannot conclude that petitioners had a reasonable basis for claiming the net operating loss carryover deduction on their joint 2003 Form 1040.

Petitioners also assert that they were not negligent because they made a reasonable attempt to ascertain the correctness of the carryover deduction, a deduction that they seem to argue would not seem to a reasonable and prudent person to be "too good to be true". They argue that Mr. Gable did not find the

transaction's tax benefits to be unusual and that he provided them with examples of similar tax-leveraged investments. Regardless of the accuracy of those statements, as stated supra we cannot conclude that petitioners made a reasonable attempt to ascertain the correctness of the 2003 carryover deduction. Accordingly, we find that, barring reasonable cause and good faith, petitioners are liable for the 20-percent accuracy-related penalty for negligence for tax year 2003.

D.  Section 6664(c) Reasonable Cause Defense

A taxpayer may avoid the section 6662(a) penalty by showing that he acted with reasonable cause and in good faith.  Sec. 6664(c)(1).  Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item.  United States v. Boyle, 469 U.S. 241, 246 (1985).  That determination is made on a case-by-case basis, taking into account all pertinent facts and circumstances, including the taxpayer's knowledge and experience.  Racine v. Commissioner, T.C. Memo. 2006-162, affd. 493 F.3d 777 (7th Cir. 2007); sec. 1.6664-4(b)(1), Income Tax Regs.

A taxpayer may demonstrate reasonable cause through the good faith reliance on the advice of an independent professional, such as a tax adviser, lawyer, or accountant, as to the item's tax treatment.  United States v. Boyle, supra at 251; Canal Corp. & Subs. v. Commissioner, 135 T.C. 199, 218 (2010).  To prevail, the

taxpayer must show that he:  (1) Selected a competent adviser with sufficient expertise to justify reliance, (2) supplied the adviser with necessary and accurate information, and (3) actually relied in good faith on the adviser's judgment.  106 Ltd. v. Commissioner, 136 T.C. 67, 77 (2011) (citing Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002)).  Reliance is unreasonable, however, if the adviser is a promoter of the transaction or suffers from "an inherent conflict of interest that the taxpayer knew or should have known about."  Neonatology Associates, P.A. v. Commissioner, supra at 98.

Petitioners assert that Mr. Gustashaw reasonably, and in good faith, relied upon the advice of:  (1) Mr. Gable as to Brown & Wood's reputation in the legal community, the quality of its tax opinion letter, and the protection that the letter would provide against the possible imposition of penalties; (2) Mr. Maulorico as to the investment potential of the CARDS transaction; and (3) Brown & Wood's tax opinion letter.

The only tax advice petitioner sought concerning the CARDS transaction was from Brown & Wood, as neither Mr. Gable nor Mr. Maulorico opined on the tax issues involved.  On brief, petitioners' arguments focus on Mr. Gustashaw's lack of knowledge of Brown & Wood's subsequently exposed conflict of interest in advising him.

We find that petitioners' reliance on Brown & Wood's tax opinion letter was unreasonable because they should have known about the law firm's inherent conflict of interest.  Chenery, the promoter of CARDS, both referred Brown & Wood to Mr. Gustashaw and supplied him with the law firm's model tax opinion letter, which described a CARDS transaction that was not unique to Mr. Gustashaw's situation.  Petitioners proffered no evidence that Mr. Gustashaw had an engagement letter with Brown & Wood, spoke to any attorney at the law firm, or directly compensated Brown & Wood for either tax opinion letter.  On the facts presented, petitioners could not have reasonably believed that Brown & Wood was an independent adviser.  See, e.g., <u>Van Scoten v. Commissioner</u>, 439 F.3d 1243, 1253 (10th Cir. 2006) ("Regardless of their level of sophistication, it was unreasonable for * * * [the taxpayers] to rely on tax professionals that they did not personally consult with, explain their unique situation to, or receive formal advice from."), affg. T.C. Memo. 2004-275.

Petitioners have not carried their burden of proving that they acted with reasonable cause and in good faith in reporting the loss and related net operating loss carryover deductions on their joint Forms 1040 for the years in issue.

II. <u>Conclusion</u>

Petitioners are liable for the section 6662(a) penalty as applied to the underpayments of tax redetermined herein.

<u>Decision will be entered</u>

<u>for respondent</u>.