T.C. Memo. 2014-47

UNITED STATES TAX COURT

HUMBOLDT SHELBY HOLDING CORPORATION AND SUBSIDIARIES,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25936-07.                    Filed March 18, 2014.

P purchased H Corp. and S Corp., two corporations that had recently realized large capital gains. To avoid paying taxes on the gains it inherited, P executed a common tax avoidance scheme to generate capital losses. Under the scheme, P contributed largely offsetting short-term options to two LLCs it had formed. P increased its bases in the LLCs by the cost of the purchased options but did not reduce its bases by the cost of the sold options. This accounting treatment allowed P to increase its bases in the partnerships by approximately $75 million while spending only $320,000.

After the options expired, P resigned from the LLCs and received stock with nominal fair market value but very high bases. P sold the stock and recognized capital losses of almost $75 million, which completely offset the gains P had inherited from H Corp. and S Corp. R issued a notice of deficiency disallowing P's claimed deductions from the stock sales and professional fee deductions P had also claimed. R further determined that P was liable for the accuracy-related penalty under I.R.C. sec. 6662.

**[*2]**       Held:  P improperly deducted capital losses on stock whose basis was artificially inflated with a transaction that lacked economic substance.

Held, further, P was not entitled to deduct professional fees under I.R.C. sec. 162.

Held, further, P is liable for the accuracy-related penalty under I.R.C. sec. 6662.

Jasper George Taylor III and Susan Virginia Sample, for petitioner.

Elaine Harris, Veronica L. Trevino, and Julie Ann P. Gasper, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  James Haber is a tax professional who has promoted tax shelters to third parties through a company called the Diversified Group, Inc. (DGI).  This case involves a tax scheme Mr. Haber carried out for his personal benefit.  Mr. Haber is petitioner's sole shareholder, and his scheme would have allowed petitioner to avoid approximately $25 million of Federal income tax while incurring costs of only $320,000.

**[\*3]** To carry out the tax scheme at issue, petitioner contributed paired options to a partnership to generate an artificially high basis in property the partnership later distributed. Petitioner recognized large capital losses when it sold the stock and reported those losses on its 2003 return to offset capital gains. Respondent disallowed the capital loss deductions and related section 162[1] business deductions and determined that petitioner was liable for a section 6662 accuracy-related penalty. The issues for decision are:

1) whether petitioner improperly claimed short-term capital loss deductions of $74,093,688 for its 2003 taxable year. We hold that it did;

2) whether petitioner improperly claimed section 162 business deductions of $1,249,925 for professional fees it incurred during its 2003 taxable year. We hold that it did; and

3) whether petitioner is liable for the accuracy-related penalty under section 6662. We hold that it is.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*4]                    FINDINGS OF FACT

Petitioner is a Delaware corporation with principal offices in New York.

Petitioner claimed capital loss deductions of $74,093,688 and deducted $1,249,925 for professional fees on its consolidated Federal income tax return for the taxable year ended November 30, 2003.  Respondent determined a deficiency of $25,617,887 in petitioner's Federal income tax for the taxable year ended November 30, 2003, and a penalty under section 6662 of $10,247,155.  Petitioner generated the disputed losses with a common tax avoidance scheme we will describe below.

1. The General Scheme

To carry out the scheme, a taxpayer first creates a partnership.  Next, the taxpayer buys and sells offsetting contingent assets and liabilities and contributes them to the partnership.  The taxpayer increases its basis in the partnership by its basis in the contingent asset but does not decrease its basis for the contingent liability.[2]  After the contingency period for the assets and liabilities expires,

_____

[2]Under sec. 722 when a party contributes property to a partnership in exchange for a partnership interest, the party takes a basis in the partnership interest equal to his or her basis in the contributed property.  Under sec. 752 a partner's basis in its partnership interest decreases when the partnership assumes a liability of the partner.  Perpetrators of this scheme have argued that in Helmer v. Commissioner, T.C. Memo. 1975-160, we held that partners should not decrease

(continued...)

[*5] usually with little or no economic consequence, the taxpayer liquidates the partnership interest and receives property. The property has a very high basis but minimal actual value. The taxpayer sells the high-basis property at its actual value and recognizes a capital loss.

## 2. Digital Options

Taxpayers have often used digital options as the offsetting contingent assets and liabilities in the avoidance scheme. A digital option is an investment that provides for a return if a designated event occurs at a designated time. For example, a digital option might provide that X will receive $20 if the S&P 500 is trading above 450 (the "strike price") on January 1, 20XX. If the S&P 500 were trading below 450 on the expiration date, X would receive nothing.

Investors can both buy and sell digital options. If X had sold the option in our example above, X would have had to pay $20 if the S&P 500 were trading above 450 on January 1, 20XX. If the S&P 500 were trading below 450 on the expiration date, X would not have to pay anything.

If an investor buys and sells options with exactly the same terms, he or she will make exactly zero on the investment. Any payment the investor would owe

---

[2](...continued)
their partnership bases when they contribute sold options.

**[\*6]** would be offset by the receipt of an identical payment. For example, if X both bought and sold the options described above and the S&P 500 were trading above 450 on the expiration date, X would both pay and receive $20. If the index were trading below 450 on the expiration date, it would neither owe nor receive a payment. In either scenario, the return on investment would be zero.

A party that intends to use digital options to generate tax losses usually will not purchase and sell options that offset completely, because a transaction that could not produce a gain or loss would too obviously lack economic substance. Instead, the party will usually purchase and sell options that ostensibly provide an opportunity for gain or loss. To accomplish this, the party will purchase options that only mostly offset. For instance, using our previous example, X would purchase an option with a strike price of 450 and sell an option with a strike price of 450.03. This arrangement would provide for a result called "hitting the sweet spot". The sweet spot is the range of prices between the strike price for the purchased option and the strike price for the sold option. In our example, if the S&P 500 were trading at 450.01 on the expiration date, X would receive payment on its purchased option and avoid payment on its sold option. Hitting the sweet spot can result in a very large windfall for an investor, but the probability of hitting it is usually very low.

[*7] 3.  The HSHC Transaction

Mr. Haber created Humboldt Shelby Holding Corp. (HSHC) to acquire

Humboldt Corp. (Humboldt) and Shelby Corp. (Shelby), two corporations with

large built-in gains.  Combined, the two corporations had assets worth

approximately $90 million, but they expected to pay $25 million in Federal

income tax on their 2003 capital gains.  Consequently, the corporations' combined

net asset value was only about $65 million.  HSHC purchased the two corporations

for $86 million and then engaged in a strategy to avoid paying taxes on the built-in

gains.

Mr. Haber created HBS Investments, LLC (HBS Investments).[3]  Humboldt

and Shelby each purchased largely offsetting digital options and contributed them

---

[3]We have simplified the facts here for readability.  Mr. Haber did not himself create HBS Investments, LLC.  Mr. Haber was the president of JSB Investments.  JSB Investments had two subsidiaries:  Brenview Holdings and Cumberdale Holdings.  Brenview and Cumberdale formed HBS Investments with initial contributions of $20,000 each.  The HBS Investments operating agreement vested all management and control in JSB Investments.

[*8] to HBS Investments.[4] Refco Capital Markets Ltd. (Refco), a commodities dealer, arranged the option trades.

Humboldt purchased an option for $70 million and sold a largely offsetting option for $69.7 million. When Humboldt contributed the options to HBS Investments, it took a basis of $70 million in the partnership interest it received. Shelby purchased an option for $4.4 million and sold a largely offsetting option for $4.38 million. When Shelby contributed the options to HBS Investments, it took a basis of $4.4 million in its resulting partnership interest. Refco agreed to allow Humboldt and Shelby to pay only the $320,000 difference between the premiums of the purchased and sold options.

The options expired three months later with no payment on either side. Humboldt and Shelby liquidated their partnership interests in HBS Investments and received common stock of various publicly traded companies. Their bases in the stock matched their bases in their partnership interests (approximately $75 million). Subsequently, they sold the distributed stock at its fair market value and

---

[4]We have again simplified the facts here for readability. Humboldt and Shelby did not purchase the options directly. Rather, each formed a corresponding LLC--Humboldt created Humboldt Trading, LLC, and Shelby created SHEL Trading, LLC. The LLCs purchased the options and contributed them to HBS Investments. When HBS Investments later liquidated, the LLCs recognized the tax losses, which then flowed to Humboldt and Shelby.

[*9] recognized losses of nearly $75 million. HSHC used the losses to offset the built-in gains it inherited when it purchased Humboldt and Shelby and avoided paying any tax on the gains.

4. Features of the Options at Issue

The Humboldt options were linked to the S&P 500 Index. Humboldt expected to receive approximately $800,000 if the index price was less than or equal to 816.93 on the expiration date and nothing if the price exceeded 816.96. Humboldt expected to receive approximately $234 million if the price fell within the sweet spot on the expiration date.

Shelby's options were linked to the NASDAQ 100 Index. Shelby expected to receive approximately $30,000 if the index price was less than or equal to 891.13 on the expiration date and nothing if the index price exceeded 891.16. Shelby expected to receive approximately $15 million if the index price fell within the sweet spot.

The option contracts gave Refco a 15-minute window on the expiration date to select the price that would control the options' outcomes. Refco could have chosen as the controlling price any value at which the indexes traded within that window. This contract provision removed any practical possibility that the options would expire within the sweet spot. The relatively long window ensured

[*10] that Refco could set a price outside of the sweet spot, and Refco had significant financial incentives to do so. Consequently, although each set of options ostensibly provided for three potential outcomes, only two were possible: (1) the options could have finished "in the money", generating $800,000 and $30,000 respectively or (2) the options could have finished "out of the money" and generated no return.

5. Fees

Petitioner deducted $1,249,925 for "professional fees" it paid in connection with the acquisition of Humboldt and Shelby and the subsequent paired-option transaction. The components of this deduction are (1) a $1,020,000 finder's fee related to the acquisition; (2) a $50,155 legal fee petitioner paid to obtain a tax opinion concerning the paired option arrangement; and (3) unsubstantiated fees totaling $179,770.

6. Criminal Investigation Involving Mr. Haber

Mr. Haber is petitioner's sole owner and the architect of its tax avoidance plan. Mr. Haber is a witness in criminal proceedings in the Southern District of New York involving a former DGI client. The U. S. attorney for that district denied Mr. Haber's request for immunity. Consequently, Mr. Haber has invoked his Fifth Amendment privilege against self-incrimination and declined to testify in

**[\*11]** these proceedings. Petitioner moved to stay the case until the criminal prosecution's conclusion. We denied the motion after finding that the interests of justice did not support further delaying the trial.

OPINION

I. Burden of Proof

The taxpayer bears the burden of proving by a preponderance of the evidence that the Commissioner's determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). The term "burden of proof" includes two distinct concepts: (1) the burden of persuasion, "i.e., which party loses if the evidence is closely balanced", and (2) the burden of production, "i.e., which party bears the obligation to come forward with the evidence at different points in the proceeding". Schaffer v. Weast, 546 U.S. 49, 56 (2005). Before trial we considered shifting the burden of proof to respondent in the light of Mr. Haber's decision to invoke his Fifth Amendment privilege and our decision to move forward with the trial in his absence. We ultimately decided against shifting the burden of persuasion because doing so would have effectively sanctioned the Commissioner for the Federal

**[*12]** prosecutor's refusal to grant Mr. Haber immunity. We did shift the burden of production to respondent and requested petitioner to provide an offer of proof regarding the testimony Mr. Haber would have provided if he had been granted immunity.

Immunity is a statutory creation whose administration Congress bestowed on the executive branch. 18 U.S.C. secs. 6002 and 6003 (2012). Congress has given the Attorney General the authority to exchange the protection of immunity for otherwise incriminating testimony when, in his judgment, a witness' testimony may be in the public's interest. United States v. Quinn, 728 F.3d 243 (3d Cir. 2013). "There is * * * overwhelming judicial and legislative authority for the proposition that review on the merits of a Federal prosecutor's decision to grant immunity is barred by statute." United States v. Herman, 589 F.2d 1191, 1201 (3d Cir. 1978). This bar extends to judicial review on the merits of a prosecutor's decision to withhold immunity. Id.

Rule 142 permits the Court to shift the burden of proof in its discretion under certain circumstances. Given the prosecutor's broad authority to make immunity decisions without judicial interference, we exercised this discretion cautiously here. After careful consideration of Mr. Haber's circumstances, we determined that he could invoke his Fifth Amendment right to avoid testifying, but

[*13] we declined to shift the burden of persuasion. After trial it is apparent that the burden of persuasion has no bearing on the resolution of this case. The evidence in the record would support our conclusion even if we had shifted the burden and even if Mr. Haber had testified as petitioner claimed in its offer of proof. Considering the significant objective evidence of his intent here, we would have given little weight to his self-serving testimony. See Faulconer v. Commissioner, 748 F.2d 890, 894 (4th Cir. 1984) ("A taxpayer's mere statement of intent is given less weight than objective facts."), rev'g T.C. Memo. 1983-165.

II. Economic Substance Doctrine

A. Overview

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 469 (1935). However, we will disregard transactions that lack economic substance, even when they formally comply with the requirements of the Code. See, e.g., Knetsch v. United States, 364 U.S. 361 (1960). Whether a transaction has economic substance is a factual determination. United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 456 (1950). We will respect a transaction when it constitutes a genuine, multiple-party transaction, compelled by business or regulatory realities, with

[*14] tax-independent considerations that are not shaped solely by tax avoidance features. Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978).

Courts have used different, though related, approaches in determining whether a transaction has economic substance. An appeal in this case would lie to the Court of Appeals for the Second Circuit, and accordingly we follow the law of that circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Second Circuit has endorsed a flexible approach in assessing economic substance. Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991), aff'g T.C. Memo. 1989-684. Under that approach, we evaluate both the transaction's objective economic substance and the taxpayer's subjective business purpose for engaging in the transaction. Id. at 148. These distinct aspects of the economic substance inquiry do not, however, constitute discrete prongs of a rigid two-step analysis. Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122, 171 n.68 (D. Conn. 2004), aff'd, 150 Fed. Appx. 40 (2d Cir. 2005). They are instead simply more precise factors to consider in the overall inquiry of whether the transaction had any practical economic effect other than the creation of tax losses. Altria Grp. Inc. v. United States, 694 F. Supp. 2d 259, 282 (S.D.N.Y. 2010), aff'd, 658 F.3d 276 (2d Cir. 2011). Courts have consistently considered the pertinent objective factors to be those relating to

[*15] the profit potential of a given transaction and the subjective factors to be those relating to the purpose of the transaction. See, e.g., Crispin v. Commissioner, 708 F.3d 507 (3d Cir. 2013), aff'g T.C. Memo. 2012-70; Klamath Strategic Inv. Fund v. United States, 568 F.3d 537 (5th Cir. 2009); Coltec Indus., Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006).

B. Application

Under the objective prong of the analysis, we consider whether the transaction had any profit potential. If both sets of options had finished in the money, the transaction would have generated a $510,000 profit independent of tax considerations.[5] However, "the existence of some potential for profit does not foreclose a finding of no economic substance". Keeler v. Commissioner, 243 F.3d 1212, 1219 (10th Cir. 2001), aff'g T.C. Memo. 1999-18. The profit potential should be evaluated in the light of the guaranteed tax benefit the transaction provides. See Sala v. United States, 613 F.3d 1249, 1254 (10th Cir. 2010) (finding that a $24 million tax benefit "dwarfed" a potential profit of $550,000 such that the "'the economic realities of [the] transaction * * * [were] insignificant

---

[5]HBS Investments would have received $800,000 on the Humboldt paired options and $30,000 on the Shelby paired options, resulting in a $510,000 profit net of the options' $320,000 cost.

**[*16]** in relation to the tax benefits of the transaction'" (quoting <u>Rogers v. United States</u>, 281 F.3d 1108, 1116 (10th Cir. 2002))).

The existence of a relatively minor business purpose will not validate a transaction if "the business purpose is no more than a facade." <u>ASA Investerings P'ship v. Commissioner</u>, 201 F.3d 505, 513 (D.C. Cir. 2000), <u>aff'g</u> T.C. Memo. 1998-305. Any seeming business purpose that existed here was merely a facade. The options could have resulted in a $320,000 loss or a $510,000 profit. These economic effects are inconsequential compared to the $25 million tax benefit the options were guaranteed to generate. Although the transaction had some profit potential, that potential was not significant enough to persuade us that petitioner engaged in the transaction for any nontax business reason.

Under the subjective prong, we determine the transaction's purpose by considering objective evidence of the taxpayer's intent. <u>See</u> <u>Hines v. United States</u>, 912 F.2d 736, 740 (4th Cir. 1990). Petitioner purchased Humboldt and Shelby for $86 million. If petitioner had paid tax on the built-in gains it inherited, it would have lost about $20 million on the purchase. Because petitioner generated artificial losses to offset the built-in gains, HSHC made a $3 million profit on the deal. Petitioner could offer $86 million only because it had devised a scheme to avoid paying the tax. After the purchase, petitioner carried out a

[*17] specific and targeted scheme to generate capital losses almost exactly offsetting the capital gains it inherited. Mr. Haber had promoted similar transactions to DGI clients as a way to avoid paying tax on their capital gains, and we have no reason to believe he engaged in this transaction for a different purpose.

Under certain circumstances, an investor may use paired options as a legitimate means of generating gains. However, the facts here demonstrate that petitioner entered the transaction solely to generate tax losses. Petitioner claims that if Mr. Haber had been available to testify, it could have established that it had nontax reasons for engaging in the option transaction. We find this unlikely. In determining the purpose of a transaction, we rely on objective evidence of intent. Mr. Haber's self-interested testimony would have done little to offset the objective evidence that tax-avoidance alone motivated the transaction.

C. Petitioner's Attempt To Distinguish Its Transaction

Petitioner admits that courts have consistently found similar tax avoidance schemes lacking in economic substance. However, petitioner attempts to distinguish its transaction. First it attempts to differentiate the economics of its transaction. Petitioner argues that its options could have generated a profit without hitting the sweet spot whereas the options in other cases had to hit the sweet spot to generate a profit. This argument does not persuade us that the

**[\*18]** options had economic substance.  As we discussed earlier, the transaction's profit potential was insignificant compared to the guaranteed tax benefits it produced.  We do not find it significant that petitioner's options were more likely to generate a profit than those in other cases.  The potential profit was not significant enough to suggest that nontax business reasons motivated the transaction.

Petitioner also attempts to distinguish its transaction on the basis that it did not initiate the scheme on the advice of a tax shelter promoter.  Courts have often found that a taxpayer's involvement with a tax shelter promoter indicated that tax avoidance primarily motivated a disputed transaction.  See, e.g., Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288; Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. 636, 693 (2008), aff'd, 608 F.3d 1366 (Fed. Cir. 2010); Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 50 (2007), aff'd in part, rev'd in part and remanded, 598 F.3d 1372 (Fed. Cir. 2010); Maguire Partners-Master Invs., LLC v. United States, 2009 WL 4907033 at \*11-\*12 (C.D. Cal. 2004), aff'd sub nom. Thomas Inv. Partners, Ltd. v. United States, 444 Fed. Appx. 190 (9th Cir. 2011).  Petitioner argues that the absence of a promoter in this case demonstrates that its transaction represented legitimate tax planning.  We disagree.

**[*19]** Mr. Haber is a tax shelter promoter. He did not need to consult a third-party promoter, because he knew the scheme well enough to execute it himself.

The subjective economic substance inquiry is whether tax avoidance solely motivated the transaction at issue. The absence of a third-party promoter does not necessarily indicate that nontax reasons motivated a transaction, especially when the taxpayer is himself an expert on the shelter at issue. We find petitioner's attempts to distinguish its case unavailing, and we accordingly reach the same result as the many courts who have considered similar transactions.

D. Conclusion

Petitioner attempted to generate nearly $75 million of capital losses with a cash outlay of only $320,000. The options could have produced a $510,000 profit independent of any tax benefit. But "the existence of some potential profit is insufficient to impute substance into an otherwise sham transaction where a common-sense examination of the evidence as a whole indicates the transaction lacked economic substance." Sala, 613 F.3d at 1254 (quoting Keeler v. Commissioner, 243 F.3d at 1219). A commonsense review of the record here reveals that tax avoidance alone motivated the transaction. Petitioner knew the transaction would produce guaranteed tax benefits of $25 million and would at

[*20] most cost $320,000.  The tax benefits alone prompted the transaction.

Accordingly, we find the transaction lacked economic substance.

III. Professional Fees

Respondent denied a $1,249,925 deduction petitioner had claimed for professional fees for the year at issue.  Petitioner has provided canceled checks and bank statements to substantiate its payment of the fees in question.  The fees include $1,020,000 petitioner paid to K&Z Partners LLC to facilitate petitioner's purchases of Humboldt and Shelby and $50,155 petitioner paid to obtain a legal opinion letter concerning the tax consequences of the paired-option contributions. Petitioner has not explained the purpose of the remaining fees.

Under section 162, a taxpayer may deduct ordinary and necessary expenses it incurs in carrying on a trade or business.  Petitioner has provided documents demonstrating that it paid all amounts associated with its professional fees deduction.  However, petitioner has provided no evidence to demonstrate a business purpose for $179,770 of the deduction.  Petitioner bears the burden of proving not only that it incurred the expenses, but also that the expenses were ordinary and necessary in carrying on its trade or business.  Petitioner has failed to carry its burden, and we accordingly sustain respondent's denial of this portion of the professional fees deduction.

**[\*21]**  Costs associated with a transaction that lacks economic substance are not deductible as business expenses under section 162.  See Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 294 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001).  We have determined that the paired-option transaction lacked economic substance.  Petitioner incurred $50,155 in legal fees to obtain a tax opinion concerning that transaction.  Accordingly, petitioner was not entitled to deduct those fees under section 162.  We sustain respondent's denial of this portion of the professional fees deduction.

"It has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures."  Woodward v. Commissioner, 397 U.S. 572, 575 (1970).  Petitioner incurred the consulting fee in connection with its acquisition of the Humboldt and Shelby stock.  Stock is a capital asset, and a taxpayer must capitalize expenses related to its acquisition.  Petitioner should have increased its bases in its Humboldt and Shelby stock by the amount of the consulting fee.  Instead, petitioner improperly deducted the expense.  We sustain respondent's denial of the deduction.

**[*22]** IV.  Penalty

Section 6662 provides that a taxpayer may be liable for a penalty of 20% of the portion of an underpayment of tax attributable to (1) a substantial understatement of income tax, (2) negligence or disregard of rules or regulations, or (3) any substantial valuation misstatement.  Sec. 6662(a) and (b)(1), (2), and (3).  A "substantial valuation misstatement" occurs if the value of any property or the adjusted basis of any property claimed on an income tax return is 200% or more of the correct amount.  Sec. 6662(e)(1)(A); sec. 1.6662-5(e)(1), Income Tax Regs.  If the valuation misstatement is 400% or more of the correct amount, the misstatement is considered a "gross valuation [misstatement]", and the 20% penalty increases to 40%.[6]  Sec. 6662(h).  The section 6662 penalties do not apply if taxpayers demonstrate they acted with reasonable cause and in good faith.  Sec. 6664(c)(1).

The IRS may impose only one accuracy-related penalty on any portion of an underpayment, even if that portion resulted from more than one of the types of

---

[6]For returns filed after August 17, 2006, the applicable percentage in sec. 6662(h)(2)(A)(i) was changed from 400% to 200%.  See Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, sec. 1219(a)(2)(A), 120 Stat. at 1083.  Similarly, for returns filed after August 17, 2006, the applicable percentage with respect to the substantial valuation misstatement penalty of sec. 6662(e)(1)(A) was changed from 200% to 150%.  See PPA sec. 1219(a)(1)(A), 120 Stat. at 1083.

**[\*23]** misconduct described in section 6662. Sec. 1.6662-2(c), Income Tax Regs. In the notice of deficiency, respondent determined that petitioner is liable for the accuracy-related penalty under section 6662(c) for negligence, section 6662(d) for a substantial understatement of income tax, section 6662(e) for a substantial valuation misstatement, and section 6662(h) for a gross valuation misstatement. Section 1.6662-2(c), Income Tax Regs., prevents respondent from stacking these penalties to impose a penalty greater than 20% on any portion of the underpayment (or 40% if that portion is attributable to a gross valuation misstatement).

Petitioner owed Federal income tax of over $25 million for its 2003 taxable year but reported and paid nothing. The underpayment resulted from a valuation misstatement. Petitioner drastically overstated its bases in securities it received upon resigning from HBS Investments. Petitioner claimed bases totaling almost $75 million, but its actual bases totaled $320,000. This valuation misstatement qualifies as "gross" under section 6662(h), and petitioner is liable for a 40% penalty on the portion of the underpayment attributable to the misstatement. See United States v. Woods, 571 U.S. ___, 134 S. Ct. 557 (2013) (holding that the gross valuation misstatement penalty applies when a transaction lacking economic substance results in a valuation misstatement).

[*24] Petitioner reported a loss of about $1.8 million on its 2003 return. A portion of the loss was attributable to its improper deduction of professional fees. Even without the professional fees deduction, petitioner would have reported a net loss. Therefore, although a portion of the understatement of <u>income</u> did not result from a gross valuation misstatement, the entire <u>tax</u> underpayment did. Therefore, we find that respondent correctly calculated the penalty as 40% of the entire underpayment.

Petitioner argues that it is not liable for the accuracy-related penalty, because it had reasonable cause for understating its income tax. In their briefs, both parties apply the special reasonable cause rules for substantial understatements of income tax resulting from tax shelter items. <u>See</u> sec. 1.6664-4(f), Income Tax Regs. However, because we determine that the accuracy-related penalty applies on account of a gross valuation misstatement, we apply the reasonable cause rules associated with the application of the penalty on that ground. <u>See</u> <u>Gustashaw v. Commissioner</u>, T.C. Memo. 2011-195; sec. 1.6664-4(b)(1), Income Tax Regs. We determine whether a taxpayer acted with reasonable cause and in good faith on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is generally the extent of the taxpayer's effort to assess the

[*25] proper tax liability. Id. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in the light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer. Id.

Petitioner's underpayment did not result from an honest misunderstanding of the law. Mr. Haber is a sophisticated tax planner who deliberately exploited a perceived loophole in the law. Petitioner did not make a reasonable effort to assess its proper tax liability. Petitioner should have known that reporting $75 million in losses from a transaction that cost $320,000 would result in a significant tax underpayment.

Petitioner claims that a straightforward interpretation of the Code and caselaw supported its tax position when it filed its return. We disagree. Petitioner's scheme depended on Mr. Haber's unreasonable interpretation of Helmer v. Commissioner, T.C. Memo. 1975-160, and its progeny. In Helmer a partnership granted a development company an option to purchase the partnership's land at a fixed price. The agreement required the development company to make annual payments to the partnership while the option remained unexercised. The annual payments were to count toward the purchase price if the development company exercised the option. The partners argued that the

**[*26]** payments increased the partnership's liabilities and thus increased their bases.[7] We disagreed because "no liability arose upon receipt of the option payments".

Petitioner relied on <u>Helmer</u> for the proposition that a sold option is not a liability, and thus partners should not decrease their bases when they contribute sold options. This interpretation was not reasonable, especially given the abusive result it achieved in this case. The options at issue here did not resemble the option we addressed in <u>Helmer</u> and did not command the same treatment. We find that petitioner has failed to establish reasonable cause and is liable for the accuracy-related penalty.

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[7]Sec. 752 provides that "[a]ny increase in a partner's share of the liabilities of a partnership * * *shall be considered as a contribution of money by such partner to the partnership." Under sec. 722, partners increase their bases for money contributions.